**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Cornell Anthony COLE, Appellant**

**No. 452 MDA 2016**

Superior Court of Pennsylvania.

Submitted February 27, 2017

Filed July 7, 2017

---

52

Kristen L. Weisenberger, Harrisburg, for appellant.

Ryan H. Lysaght, Assistant District Attorney, Harrisburg, for Commonwealth, appellee.

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and STEVENS, P.J.E.*

OPINION BY BENDER, P.J.E.:

Appellant, Cornell Anthony Cole, appeals from the judgment of sentence of 80–180 months' incarceration, imposed following his conviction of four counts each of burglary and conspiracy. After careful review, we affirm.

Appellant was charged with participating in a string of eight commercial burglaries in 2013, at eight different locations in Dauphin, Chester, Luzerne, and Schuylkill counties. Appellant was also charged with conspiracy offenses related to each burglary, which, depending on the case, involved one or more of Appellant's co-defendants, Troy Baker and Cornelius Smith.[1] Following a jury trial which commenced on January 22, 2016, and concluded on February 5, 2016, Appellant was convicted of burglary and conspiracy counts related to four of the incidents, and acquitted with respect to all remaining counts. Specifically, at CP–22–CR–0000036–2014 (hereinafter "0036"), Appellant was convicted of conspiring to, and having burglarized, Barr's Exxon in Schuylkill County, Thorndale Exxon in Chester County, and Blue Ridge Country Club in Dauphin County. At CP–22–CR–0002152–2014 (hereinafter "2152"), Appellant was convicted of conspiring to, and having burglarized, Shell Gas Station in

---

* Former Justice specially assigned to the Superior Court.

1. There are indications in the record that there was a third coconspirator who was not involved in this trial.

Luzerne County. On February 23, 2016, the trial court sentenced Appellant to an aggregate term of 80–180 months' incarceration.[2]

Appellant filed a timely notice of appeal on March 18, 2016. He filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on April 8, 2016. The trial court issued its Rule 1925(a) opinion on September 20, 2016.[3] Appellant now presents the following questions for our review:

 A. Whether the trial court erred in denying Appellant's pretrial motion to sever offenses where the acts alleged were not considered a single criminal episode[?]

 B. Whether the trial court erred in denying Appellant's pretrial motion to sever [his] trial from that of his co-defendants where different evidence applied to each case[?]

 C. Whether the trial court erred in denying Appellant's pretrial motion to suppress evidence observed by the Howard County police officers where they acted in violation of the Municipal Police Jurisdiction Act[?]

 D. Whether the trial court erred in denying Appellant's pretrial motion to suppress evidence obtained from the cellular phone where police violated the Pennsylvania Wiretap Act[?].

 E. Whether the trial court erred in denying Appellant's pretrial motion to exclude evidence of uncharged misconduct as prior bad acts[?]

 F. Whether the trial court erred in denying Appellant's request for relief under Pa.R.Crim.P. 600[?]

 G. Whether the trial court erred in denying Appellant's request for a mistrial where the Commonwealth in opening statements averred prior bad acts which fell outside the trial court's pretrial ruling[?]

 H. Whether the trial court erred in denying Appellant's request for a mistrial where the Commonwealth mischaracterized testimony presented by their expert witness[?]

 I. Whether the trial court erred in denying Appellant's request for a mistrial where a Commonwealth witness averred prior bad acts which fell outside the trial court's pretrial ruling[?]

Appellant's Brief at 7–8 (unnecessary capitalization omitted).

### Severance

 ■ Appellant's first two claims concern his motions to sever offenses and co-defendants. "We consider the decision of whether to deny a motion to sever under an abuse of discretion standard." *Commonwealth v. O'Neil*, 108 A.3d 900, 905 (Pa. Super. 2015). With respect to the severance of offenses:

Offenses charged in separate informations may be tried together if they are "based on the same act or transaction" or if "the evidence of each of the offenses would be admissible in a separate

---

**2.** Appellant received consecutive sentences of 16–36 months' incarceration for each burglary count, and another consecutive term of 16–36 months' incarceration for the Barr's Exxon conspiracy. For the three remaining conspiracy convictions, Appellant was sentenced to concurrent terms 16–36 months' incarceration.

**3.** Following a single request for an extension of time to file Appellant's brief, which was granted by this Court by order dated June 29, 2016 (resetting the due date for the brief to August 4, 2016), Appellant timely filed his brief with this Court on August 4, 2016. However, he did so prior to the issuance of the trial court's opinion. Appellant does not explain why he did not request any further extensions of time, given that the trial court had yet to respond to his Rule 1925(b) statement with its Rule 1925(a) opinion.

trial for the other and is capable of separation by the jury so that there is no danger of confusion." Pa.R.Crim.P[ ]. 582(A)(1). The court has discretion to order separate trials if "it appears that any party may be prejudiced" by consolidating the charges. Pa.R.Crim.P[ ]. 583. *Commonwealth v. Thomas*, 879 A.2d 246, 260 (Pa. Super. 2005). The comment to Rule 563 (Joinder of Offenses in Information) indicates that "it is assumed that offenses charged in the same information will be tried together, unless the court orders separate trials." Pa.R.Crim.P. 563 (comment).

■ Our Supreme Court has consolidated these rules into a three-part severance test:

Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations, the court must therefore determine: [1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, [3] whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Commonwealth v. Collins*, 550 Pa. 46, 703 A.2d 418, 422 (1997) (quoting *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491, 496–97 (1988)).

■ Here, Appellant was charged with eight burglaries at eight separate locations, which occurred across four counties, and involved numerous investigating police departments. Appellant concedes that certain evidence was common to multiple burglaries, such as cell phone evidence which demonstrated his presence at all eight locations, and expert testimony regarding evidence (paint chips which corresponded to evidence obtained from the Barr's Exxon burglary) found on a crowbar in his car when he was arrested immediately following the Shell Gas Station burglary. However, Appellant argues that

the Commonwealth called at least twelve (12) witnesses who could only testify to only one (1) burglary. The Commonwealth called five (5) witnesses to provide testimony relating only to the Barr's Exxon burglary. The Commonwealth presented four (4) witnesses to provide testimony relating to the Blue Ridge Country Club burglary only. The Commonwealth called at least two (2) witnesses to present evidence as to only the burglary at the Thorndale Exxon. The Commonwealth called an employee and Pennsylvania State Police Trooper to provide testimony only regarding the ... Shell Station [burglary].

If a witness had testimony to give involving more than one burglary, the witness testified more than once, making the trial even longer and more confusing. Investigator John McPhillips, Howard County Officer Dale Kreller, and Detective James Glucksman all testified multiple times.

Appellant was unduly prejudiced by having each burglary tried together. The voluminous testimony presented by the Commonwealth just to establish a burglary occurred made it difficult for jurors to focus on identity evidence relative to each burglary. Especially considering the fact that a burglary occurred was not at issue. Each burglary could have been prosecuted without overlapping witnesses. Grouping all eight (8) burglaries into one (1) trial created confusion and prolonged the trial process.

Appellant's Brief at 24–25.

The trial court decided against severance of offenses because "the burglaries

took place over an approximately five (5) month period within and around central Pennsylvania." Trial Court Opinion (TCO), 9/20/16, at 10. Each burglary usually involved the same two co-conspirators, and strikingly similar circumstances in each case, in "the way each burglary was carried out, [and] the time of occurrence of each burglary." *Id.* Each burglary occurred at night. Each burglary involved the dismantling of the security systems in place, either through the cutting of external alarm wires, or the removal of internal security mechanisms such as alarm panels and DVR systems and, often, both. Cash and cigarettes were the primary targets of the heists. This evidence, collectively, established a *modus operandi* ("MO") for the multi-month burglary scheme carried out by the perpetrators, evidence corroborated by the items discovered in the vehicle in which Appellant was found and stopped by police following the last burglary incident. Identity evidence was also established with cell phone and GPS tracking data, linking Appellant and his cohorts to the vicinity of the burglary locations at the very same time the burglaries occurred.

We agree with the trial court that the evidence from each of these burglaries would have been admissible in the trials for the others. As noted above, the evidence of each burglary tended to prove in the others, "preparation" and a coordinated "plan," the "identity" of the co-conspirators, as well as a "lack of accident" in terms of explaining why Appellant and his cohorts just happened to be near each location at the time of each of the burglaries. *See* Pa.R.E. 404(b)(2) (permitted uses of other-bad-acts evidence). His presence near eight burglaries over 5 months, where each burglary was characterized by substantially similar circumstances pointing to a common culprit or culprits, is powerful identity evidence.

With regard to whether the evidence from the different burglaries was capable of separation by the jury, and whether Appellant was unduly prejudiced by the decision not to sever the cases, the trial court notes that the verdict speaks for itself: Appellant was acquitted of several burglaries and conspiracy counts, indicating that the jury clearly was able to parse the evidence involved in each individual case. *See* TCO at 11. We agree. *See Commonwealth v. Dozzo*, 991 A.2d 898, 903 (Pa. Super. 2010) (holding that "the jury found [the A]ppellant not guilty of all charges in one case, and not guilty of three out of four charges in a second case, demonstrating the jury considered each case and each charge separately and did not cumulate the evidence"). Accordingly, we conclude that the trial court did not abuse its discretion in declining to order separate trials for each offense.

 Appellant also argues that the trial court should have ordered separate trials for each co-defendant/co-conspirator. However, as correctly noted by the trial court, there is a universal preference for a joint trial of co-conspirators. TCO at 10. As our Supreme Court explained in *Commonwealth v. Housman*, 604 Pa. 596, 986 A.2d 822, 834 (2009), "joint trials are preferred where conspiracy is charged. [Nevertheless, s]everance may be proper where a party can establish the co-defendants' defenses are so antagonistic that a joint trial would result in prejudice.... However, the party seeking severance must present more than a mere assertion of antagonism[.]"

In Appellant's brief, he makes minimal efforts to establish or explain how his and his co-defendants' defenses were so antagonistic so as to warrant separate trials. Appellant's Brief at 25–26. Appellant only notes that not all co-defendants were charged with every burglary, and that

some discrepancies existed in the cell phone ping evidence. *Id.* We conclude that Appellant's short, undeveloped argument in this regard is wholly unconvincing, especially given our courts' preference for a joint trial of co-conspirators. Accordingly, we conclude that the trial court did not abuse its discretion when it refused to sever the trials for the burglaries for each coconspirator.

### Suppression

Appellant's next two claims concern the trial court's denying of Appellant's motion to suppress certain evidence. With regard to both claims:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783–84 (Pa. Super. 2012) (quoting *Commonwealth v. Hoppert*, 39 A.3d 358, 361–62 (Pa. Super. 2012)).

The first suppression claim is in regard to evidence obtained by Howard County (Maryland) Police Officer Dale Kreller regarding the Blue Ridge Country Club burglary. Specifically, the target of Appellant's suppression motion was evidence of Officer Kreller's observations at the scene (descriptions of the perpetrators' clothing and behavior), and the identification of Appellant's van, which was parked behind co-defendant Baker's truck, near the scene of the crime, and GPS tracking data the officer collected. Appellant claims this evidence was suppressible on the basis that it was obtained in violation of the Municipal Police Jurisdiction Act (MPJA), 42 Pa.C.S. § 8953.

Some factual background is necessary to understand the nature of the evidence sought to be suppressed, as well as the manner in which it was obtained. Appellant's driver's license and debit card were found at the scene of a burglary of Cindy Skylight Liquors in Elkridge, Maryland, on August 12, 2013. N.T. Suppression Hearing, 8/26/14, at 16–18. Initially, officers responding to the burglary collected these items from the scene of the burglary, processed them into evidence, where they were reviewed by Officer Nathan Guilfoyle, who initially led the investigation. Officer Guilfoyle took this evidence to the Repeat Offender Proactive Enforcement (ROPE) Division of the Criminal Investigations Bureau of the Howard County Police Department.

Officer Kreller was a supervising member of the ROPE team, and the ROPE team's primary purpose was to assist other criminal investigation divisions by providing covert surveillance of individuals suspected of committing crimes in or around Howard County. *Id.* at 55. Essentially, Officer Kreller was assigned to follow Appel-

lant and report on any suspicious or criminal activity observed.

Initially, Officer Kreller obtained historical cell phone tracking data which indicated the presence of Appellant's cell phone and his co-defendants'. cell phones near the Cindy Skylight Liquors at the time that business was burglarized.[4] *Id.* at 62–64. Officer Kreller stated that Appellant and his cohorts were already on the ROPE team's radar due to prior investigations, and that they had already been aware of their "unique MO." *Id.* at 93. Appellant and his co-defendants were already suspected in multiple prior burglaries. *Id.* Officer Kreller began to focus on Appellant because of the ID evidence obtained at the Cindy Skylight Liquors burglary. *Id.* at 95. On one occasion prior to his foray into Pennsylvania while tracking Appellant, Officer Kreller observed him, in his white van, meet up with co-defendant Smith, in his Yukon. *Id.* at 96. Officer Kreller followed them to a gas station in Woodbine, Maryland, where a burglary of a gas station occurred that same evening. *Id.* Officer Kreller also observed co-defendant Troy Baker and another individual ostensibly casing a gas station in Bartonsville, Maryland. *Id.* Baker and his cohort were seen "on the roof" of the business at 2:30 a.m., inexplicably but for nefarious motives, although it appears as if they did not attempt to gain entry at that time. *Id.*

On August 26, 2013, the evening of the Blue Ridge Country Club burglary, Officer Kreller was in Howard County when he was alerted that the suspects were moving north on Interstate 83 in Maryland. Officer Kreller followed them all the way to Harrisburg, Pennsylvania. *Id.* at 98. Eventually, he tracked them to the Blue Ridge Country Club, where he first observed Appellant and Troy Baker circling the surrounding area in Baker's vehicle. *Id.* at 97–99. Subsequently, Officer Kreller observed the following:

So we heard an audible alarm from the Blue Ridge and we knew they were in that area. And at this point it's really tough on us trying to get in as close as we can without being compromised. So basically myself and another detective were laying in a fairway of the golf course where we watched suspects walk across the fairway to the direction of what I would refer to as the clubhouse, or the pro shop where they were there for an extended period of time.

And then we observed two suspects walk back across the fairway. I don't know of the time, five, ten minutes. I would have to review my report how long it was, where they were at the direction of the pro shop. But once they walked back across the fairway there was then four suspects that came into our view as they walked along Route 39 dressed in all black clothing, ski masks, and items in their hand.

As cars came on along Route 39 the suspects would go to the guardrail. They would go to the wood side of guardrail. They would hunch down where it looks thick. They were trying to hide themselves from traffic. And they would then walk back and continue along Route 39.

*Id.* at 100. Officer Kreller did not enter Pennsylvania in response to a request from any Pennsylvania police department. However, neither Officer Kreller nor his ROPE team members attempted to effectuate an arrest of any of the individuals he observed at that time. *Id.* at 103.

---

4. The Commonwealth sought to admit this historical cell phone tracking data under Pa. R.E. 404(b).

Appellant sought to suppress these observations, as well as the cell phone tracking evidence that led Officer Kreller to follow the defendants to the Blue Ridge Country Club, based on the claim that Officer Kreller made these observations in violation of the MPJA, which reads, in pertinent part, as follows:

(a) **General rule.**—Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:

(1) Where the officer is acting pursuant to an order issued by a court of record or an order issued by a district magistrate whose magisterial district is located within the judicial district wherein the officer's primary jurisdiction is situated, or where the officer is otherwise acting pursuant to the requirements of the Pennsylvania Rules of Criminal Procedure, except that the service of an arrest or search warrant shall require the consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which regularly provides primary police services in the municipality wherein the warrant is to be served.

(2) Where the officer is in hot pursuit of any person for any offense which was committed, or which he has probable cause to believe was committed, within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense.

(3) Where the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park police officer or otherwise has probable cause to believe that the other officer is in need of aid or assistance.

(4) Where the officer has obtained the prior consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which provides primary police services to a political subdivision which is beyond that officer's primary jurisdiction to enter the other jurisdiction for the purpose of conducting official duties which arise from official matters within his primary jurisdiction.

(5) Where the officer is on official business and views an offense, or has probable cause to believe that an offense has been committed, and makes a reasonable effort to identify himself as a police officer and which offense is a felony, misdemeanor, breach of the peace or other act which presents an immediate clear and present danger to persons or property.

(6) Where the officer views an offense which is a felony, or has probable cause to believe that an offense which is a felony has been committed, and makes a reasonable effort to identify himself as a police officer.

42 Pa.C.S. § 8953(a).

Appellant contends that "[h]ad Officer Kreller not been in Pennsylvania unlawfully, the Commonwealth would be unable to present at trial testimony that Appellant's van was in Dauphin County; only that his cell phone pinged there. Officer Kreller[ ] used his observations from his training and experience, to conclude that the suspects matched ... Appellant,

and that a burglary did occur." Appellant's Brief at 30.

The courts of this Commonwealth have consistently held that in applying the MPJA in a manner that effectuates its purpose, we should construe its provisions liberally.

This Act is not among those statutes which must be strictly construed under the rules of statutory construction, but instead is subject to liberal construction to effectuate its objectives and to promote justice. *Commonwealth v. McHugh*, 413 Pa.Super. 572, 605 A.2d 1265 (1992). Specifically, one of the principle objectives to be obtained by this Act is to promote public safety while maintaining jurisdictional police lines. *Commonwealth v. Merchant*, 528 Pa. 161, 595 A.2d 1135 (1991). However, as our Supreme Court stated in *Merchant*, "the General Assembly recognized that constructing impenetrable jurisdictional walls benefited only the criminals hidden in their shadows." *Id.* at 169, 595 A.2d at 1139.

*Commonwealth v. Eisenfelder*, 444 Pa.Super. 435, 664 A.2d 151, 153 (1995).

*Commonwealth v. Peters*, 915 A.2d 1213, 1217–18 (Pa. Super. 2007), *aff'd and adopted*, 600 Pa. 268, 965 A.2d 222 (2009).

Appellant provides scant argument as to how Officer Kreller violated the MPJA, and he fails to offer any analysis comparing and/or contrasting the facts of this case with existing precedent concerning the use of suppression as a remedy for violations of the MPJA. The trial court had similar concerns:

We are unable to ascertain how the Maryland Officers 'illegally' entered the Commonwealth of Pennsylvania thus causing their visual observations to be suppressed. The ROPE team was operating and investigating suspect[s] [who] were believed to be in their own jurisdiction. After tracking the suspects to Pennsylvania, they observed them at a golf course and did not attempt to make an arrest. Instead, they followed the proper channels and made contact with detectives in Pennsylvania. We further note that Detective Glucksman[5] and the Maryland Officers [subsequently] entered a joint operation in an attempt to stop this string of burglaries that had been occurring in their jurisdiction. [Appellant] was ultimately arrested by Pennsylvania State Troopers and Detective Glucksman was the affiant in this case. Accordingly, it is clear that this [c]ourt did not err in denying [Appellant's] pretrial motion to suppress any and all evidence observed by the Howard County Police Officers.

TCO at 12–13.

We agree with the trial court. Appellant cites to no authority that prevents police officers in this Commonwealth, or from any other state, from merely investigating suspects when they depart from the officers' primary jurisdictions.

The only case cited by Appellant which is remotely on point is *Commonwealth v. Bradley*, 724 A.2d 351 (Pa. Super. 1999) (*en banc*), which, as discussed below, is of questionable authority. In *Bradley*, this Court held that evidence obtained following the detention of a suspect was properly suppressed, where the arresting officer detained the suspect "under color of state law and without authority under the Municipal Police Jurisdiction Act." *Id.* at 356. Here, Officer Kreller made no efforts to arrest or otherwise detain Appellant and his cohorts at the time he observed their

---

**5.** Detective Glucksman, a Pennsylvania police officer, was the affiant in this case.

behavior in Pennsylvania before, during, and after the Blue Ridge Country Club burglary. Accordingly, even under the standard this Court expressed in *Bradley*, Appellant is not entitled to relief.

Moreover, this Court has already recognized that *Bradley* is not, and perhaps has never been, binding precedent, given our Supreme Court's prior ruling in *Commonwealth v. O'Shea*, 523 Pa. 384, 567 A.2d 1023 (1989):

> In *Bradley*, this Court did not recognize the case by case approach espoused by our Supreme Court in *O'Shea*, and instead unequivocally stated that "the exclusionary rule applies even if the police officer acts in good faith or the police officer's actions would have been lawful if performed within the proper jurisdictional limits." *Bradley*, 724 A.2d at 354. Subsequent to our decision in *Bradley*, this Court decided [*Commonwealth v.*] *Chernosky*, 874 A.2d 123 (Pa. Super. 2005) (*en banc*),] another *en banc* decision, and therefore, we consider our holding in *Chernosky* to be binding precedent on this issue.

*Peters*, 915 A.2d at 1222 n.2. In *Chernosky*, based on our reading of *O'Shea*, this Court held that "even if a violation of the MPJA had occurred, suppression is not an appropriate remedy" in every case. *Chernosky*, 874 A.2d at 129.

In sum, we are not convinced by Appellant's underdeveloped argument that Officer Kreller violated the MPJA by merely making observations outside of his own jurisdiction. It is simply not tenable to apply the MPJA every time an investigation takes an officer outside of his home jurisdiction, whether it is to interview a witness, investigate a tip or, as in this case, to conduct surveillance which, at least in part, did require a warrant or court order. Such an interpretation of the MPJA is inconsistent with its purpose; it neither promotes justice nor public safety. *See Peters, supra.* This is especially true when an officer's extra-jurisdictional actions do not involve the direct exercise of police powers, such as effectuating searches, seizures, temporary detentions, and/or arrests. Accordingly, we conclude that Appellant's third claim lacks merit.

Next, Appellant contends that police violated Pennsylvania's Wiretapping and Electronic Surveillance Control Act (Wiretap Act), 18 Pa.C.S. § 5701 *et seq.*, when it tracked his cell phone's live-ping data and collected his historical phone records. The Wiretap Act states that:

> [A] person is guilty of a felony of the third degree if he:
>
> (1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication;
>
> (2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or
>
> (3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.

18 Pa.C.S. § 5703. As the courts of this Commonwealth have interpreted the statute, an 'interception' is a "contemporaneous acquisition" of a wire, electronic, or oral communication. *Commonwealth v. Proetto*, 771 A.2d 823, 829 (Pa. Super.

2001), *aff'd*, 575 Pa. 511, 837 A.2d 1163 (2003) (adopting the Superior Court's opinion as its own).

The entirety of Appellant's argument is as follows:

The Pennsylvania Wiretap Act was recently amended to include mobile communications tracking (cell phone tracking) as a method of data collection requiring probable cause and a court order. Specifically, 18 Pa.C.S.[ ] § 5773 dictates that the court shall issue an order for disclosure of mobile communications tracking information upon showing of probable cause. This includes "the installation and use of a pen register, a trap and trace device or a telecommunication identification interception device. . . ." 18 Pa.C.S.[ ] § 5773.

Pennsylvania authorities did not obtain a search warrant. A Magisterial District Judge or Dauphin County or Court of Common Pleas Judge did not review the facts and determine whether probable cause existed to obtain a copy of [A]ppellant's historical phone records or live ping his cellular phone.

Detective James Glucksman, with the Lower Paxton Township Police Department, testified Lancaster Police had volunteered to get the proper warrants to live ping the appellant's phone. However, once the suspects were cleared from the Lancaster burglaries, they did not proceed with the warrants. Detective Glucksman was made aware of the fact Lancaster did not obtain a warrant; however, he did not seek a warrant himself. Detective Glucksman was aware he needed a warrant or he would not have asked Lancaster Police to prepare one.

Furthermore, Detective Glucksman did obtain a court order from Pennsylvania to monitor the GPS tracker placed on codefendant Baker's car. Sadly, it appears nothing less than laziness prevented a warrant from being obtained for access to [A]ppellant's records and live ping tracking. Without a proper warrant, all evidence should have been suppressed.

Appellant's Brief at 32–33 (internal citations to the reproduced record omitted).

Under the pre-amended version of the Wiretap Act, therefore, a historical record of cell phone transmissions was, by its very nature, not likely to be recognized as a "contemporaneous acquisition" of a wire, electronic, or oral communication. *See* ***Proetto***, 771 A.2d at 829 (holding that text messages forwarded to a police officer after their initial transmission were not intercepted by police, but instead "later disclosed" to police and, therefore, not "contemporaneously" acquired, as prohibited by the Wiretap Act). However, the Wiretap Act was later amended (effective December 24, 2012), to include the following provision:

A provider of electronic communication service or remote computing service shall disclose a record or other information pertaining to a subscriber to or customer of the service, not including the contents of communications covered by subsection (a) or (b) [pertaining to the content of communications], to an investigative or law enforcement officer *only* when the investigative or law enforcement officer:

 (i) uses an administrative subpoena authorized by a statute or a grand jury subpoena;

 (ii) obtains a warrant issued under the Pennsylvania Rules of Criminal Procedure;

 (iii) obtains a court order for the disclosure under subsection (d); or

 (iv) has the consent of the subscriber or customer to the disclosure.

18 Pa.C.S. § 5743(c)(2) (emphasis added).

Moreover, as Appellant correctly notes above, the amendment also specifically

requires police to seek a court order to obtain "mobile communications tracking information." 18 Pa.C.S. § 5773(a). Accordingly, it is clear that both the real-time tracking of Appellant's cell phone, as well as the acquisition of the historical records of his cell phone's transmissions, which provided the basis for establishing a history of the device's locations, fell under the purview of the Wiretap Act.

In rejecting Appellant's suppression claim, the trial court

> determined that the ROPE team (Howard County Police officers) had proper authority to obtain [this] evidence. Sergeant Sarah Kayser, of the Howard County Police Department, testified that she had obtained a Maryland Court Order permitting the officers to place an electronic monitoring device on co-defendant Baker's 2003 GMC Yukon. Additionally, the Commonwealth introduced these Court Orders into evidence as Commonwealth's Exhibits 381, 382, [and] 383. After observing the Defendant(s) at the Blue Ridge Country Club, the ROPE team properly made contact with Detective Glucksman here in Pennsylvania and a joint operation was set up. To hold that an out-of-state police officer could never present evidence of an in-state case would create an absurd result in that police officers across the country would only be limited [to operate in] the municipal jurisdiction in which they work.

TCO at 14.

■ Initially, we must note that despite our thorough review of the record, this court could not ascertain where Appellant raised a Wiretap Act claim in the trial court with respect to his cell phone's historical records. Although no such waiver concerns were mentioned by the trial court in its Rule 1925(a) opinion, or by the Commonwealth in its brief, an appellant must

identify where in the record an issue was preserved or this Court may deem it waived. *See* Pa.R.A.P. 2117(c); 2119(e). Moreover, "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Appellant briefly states that he "litigated the issues involving suppression of evidence related to ... exclusion of all cell phone related evidence" at the August 26, 2014 suppression hearing. Appellant's Brief at 10. However, Appellant does not direct this Court's attention to where, in the 268 page transcript of that hearing, any specific claim was raised. Moreover, in Appellant's May 23, 2014 Omnibus Pretrial Motion, Appellant only raised a Wiretap-Act-related suppression claim with respect to the live tracking of his cell phone, and made no mention of a Wiretap Act claim pertaining to the acquisition of his cell phone's historical records. Defendant's Omnibus Pretrial Motion, 5/23/14, at ¶¶ 73–81 (unnumbered pages). For these reasons, we must conclude that Appellant has waived the aspect of the instant issue pertaining to his cell phone's historical records. However, we conclude that he has adequately preserved this issue with respect to the real-time tracking of his cell phone.

The trial court provides no discussion or analysis of the Wiretap Act in relation to the facts of this case. While the court notes that the ROPE team acquired a court order in Maryland to place a tracking device on codefendant Baker's vehicle, it makes no mention of any court orders or warrants authorizing the real-time tracking of Appellant's cell phone in its analysis of this issue. However, elsewhere in its opinion, the trial court does note that "[o]rders had been obtained to do a live GPS tracking for the cell phones of Mr. Baker, [Appellant], and Mr. Smith." TCO at 8. The court appears to justify the use of this evidence

based on the MPJA, suggesting that any evidence that was collected by the ROPE team could be shared with Pennsylvania authorities, assuming that evidence was obtained legally by Maryland authorities. However, this merely begs the question: does a court order issued in Maryland to Maryland police, which was used to live-track Appellant's cell phone *in Pennsylvania*, violate Pennsylvania's Wiretap Act?

 The Commonwealth asserts that "Pennsylvania officers did not [have to] obtain duplicate orders authorizing redundant investigations...." Commonwealth's Brief at 16. However, the Commonwealth, like the trial court, fails to elucidate as to why Maryland court orders to live-track Appellant's cell phone satisfy Pennsylvania's Wiretap Act. Neither the trial court, the Commonwealth, nor Appellant identify this matter as an issue of first impression, or offer any guidance to this Court by way of existing case law. Nevertheless, it is Appellant who ultimately bears the burden to demonstrate on appeal that the trial court erred in failing to grant suppression.

We begin our analysis of this question by resolving a factual matter. Because the trial court indicates that the live-tracking of Appellant's cell phone was lawfully authorized by a Maryland Court order, and because Appellant does not affirmatively dispute that finding, we assume that order was lawfully issued under Maryland law.

With this assumption in mind, the issue before us can be distilled down to whether the Wiretap Act requires a separate order, issued by a Pennsylvania Court, when an out-of-state order for live-tracking of a cell phone is used to monitor a cell phone in Pennsylvania, and the evidence obtained therefrom is sought to be presented in a Pennsylvania courtroom. For the following reasons, we hold that no such redundancy was required in the circumstances of this case.[6]

 We recognize that:

Pennsylvania's ... Wiretap Act emphasizes the protection of privacy, *see generally Commonwealth v. DeMarco*, 396 Pa.Super. 357, 371, 578 A.2d 942, 949 (1990), and, consistent with such emphasis, provides a statutory exclusionary rule that extends to non-constitutional violations. ... Because of this privacy concern, the provisions of the Wiretap Act are strictly construed. *See Boettger v. Miklich*, 534 Pa. 581, 586, 633 A.2d 1146, 1148 (1993).

*Commonwealth v. Spangler*, 570 Pa. 226, 809 A.2d 234, 237 (2002).

 Appellant's claim in this case constitutes a very narrow argument based on a hypertechnical reading of the Wiretap Act: that the Wiretap Act is violated when a lawfully issued out-of-state court order to live-track a cell phone extends into

6. We expressly limit this ruling to this assumption and, additionally, that the out-of-state order would have substantially complied with Wiretap Act, if it had instead been sought from, and issued by, a Pennsylvania court. The "Wiretap Act is modeled on Title III ... of the Omnibus Crime Control and Safe Streets Act of 1968. Title III authorizes states to adopt wiretap statutes that trigger greater, but not lesser, protection than that available under federal law." *Commonwealth v. Deck*, 954 A.2d 603, 607 (Pa. Super. 2008). In this framework, it would be contrary to the legislative intent in adopting Pennsylvania's Wiretap Act, and whatever greater protection the act might provide as compared to federal law, if Pennsylvania's law enforcement community could circumvent those greater protections by using out-of-state authorities as surrogates to obtain out-of-state court orders or warrants, issued under less stringent standards, to monitor cell phones or similar devices located in Pennsylvania. As discussed below, Appellant has offered no evidence that a lower standard exists in Maryland for conducting surveillance in a manner that, if initiated in Pennsylvania, would come under the purview under the Wiretap Act.

Pennsylvania. Appellant cites no relevant case law to justify this view, although it does appear to be a matter of first impression. Nevertheless, Appellant offers no analysis of the Act itself, its history, or how its analogues have been interpreted by other states, to support his view that clear violation occurred in this case. This is particularly troublesome considering our reading of the Wiretap Act indicates that it is essentially silent on the question before this Court, offering no guidance one way or the other.

The trial court, as noted above, believes that preventing out-of-state police from testifying in Pennsylvania Courts when they acted lawfully in obtaining the live-tracking order, and where they had simply continued to follow a suspect across state lines, is "an absurd result." TCO at 14. We agree with the trial court, with some caveats. First, we agree because, under the facts of this case, there does not appear to be any evidence that the Maryland live-tracking order was issued in any sort of purposeful attempt to circumvent Pennsylvania's Wiretap Act. The ROPE team lawfully obtained the order in Maryland to track Appellant's cell phone, and it was Appellant's actions that led them to cross state lines. Accordingly, there is no issue in this case involving any sort of deliberate attempt to bypass Pennsylvania's Wiretap Act. *See* footnote 5, *supra*.

Second, we see no evidence that Maryland's and Pennsylvania's standards for

obtaining such orders are significantly different so as to trigger a concern that the Maryland live-tracking order was issued under a more liberal standard than would have applied in Pennsylvania under the same facts. It appears as if the legal standard in Maryland is at least as stringent in Pennsylvania, and perhaps even more rigorous, although there appear to be some variations in technical requirements between the laws of the two jurisdictions.[7] Appellant concedes that, in Pennsylvania, a live-tracking order is governed by 18 Pa. C.S. § 5773. Appellant's Brief at 32. Such an order may be issued "if the court finds that there is probable cause to believe that information relevant to an ongoing criminal investigation will be obtained by such installation and use on the targeted telephone." 18 Pa.C.S. § 5773(a). Appellant makes no effort in his brief to argue that the standard in Maryland is lower and, in fact, it is not. In *State v. Andrews*, 227 Md.App. 350, 134 A.3d 324 (2016), the intermediate appellate court in Maryland held that

> unless a valid exception to the warrant requirement applies, the government may not use a cell phone simulator[8] without a warrant or, alternatively, a specialized order that requires a particularized showing of probable cause, based on sufficient information about the technology involved to allow a court to contour reasonable limitations on the scope and manner of the search, and that pro-

---

7. Pennsylvania's Wiretap Act requires a district attorney to seek a live-tracking order from an intermediate appellate court, the Superior Court of Pennsylvania. It does not appear that similar technical requirements apply in Maryland, as there is no indication in the record that the ROPE team applied for the court order to track Appellant's cell phone with the assistance of a Maryland district attorney. Additionally, the record does disclose that they applied for and received the order in question from a Maryland Circuit Court, which is a trial-level court of general jurisdiction in Maryland. Nevertheless, as noted *infra*, the legal standard for obtaining a warrant or court order to live-track a cell phone in Maryland appears to be at least if not greater than that required under Pennsylvania's Wiretap Act.

8. A "cell phone simulator" was the device used in *Andrews* which allowed police to live-track Andrew's cell phone.

vides adequate protections in case any third-party cell phone information might be unintentionally intercepted.

*Andrews*, 134 A.3d at 360–61 (footnote omitted). Clearly, in both states, an order issued to live-track a cell phone requires a minimum showing of probable cause. If anything, it appears that the legal standard in Maryland for obtaining such an order might be more stringent than in Pennsylvania, as *Andrews* Court indicates that such an order requires both "reasonable" scope and manner limitations, as well as "adequate protections" for third parties. *Id.* It is not clear that the Wiretap Act requires consideration of those specific concerns.

Third, Appellant has not argued, and we see no basis for concluding, that his expectation of privacy, in the location data conveyed by his cell phone, was impacted or altered when he crossed into Pennsylvania while the ROPE team was tracking him. As noted above, the standard for overcoming his privacy interest was essentially the same or greater in Maryland courts. His privacy interest itself, however, remained the same under either standard.

■ Finally, the fact that the provisions of the Wiretap Act must be strictly construed, *see Spangler*, 809 A.2d at 237, weighs against a finding that suppression should have been granted in this case. Typically, we strictly interpret a statute in a manner that favors the party accused of offending its provisions, not in favor of the victim of the conduct which is prohibited. Given the Wiretap Act's ambiguity as to the cross-jurisdictional concerns at issue in this case, and the complete lack of guidance from existing case law interpreting the act on that point, we must conclude that our principle of strictly construing penal statutes constrains this Court to conclude that Appellant's claim—that the Wiretap Act was violated by the live-

tracking of his cell phone—has not been established under the facts of this case. Accordingly, for all the above reasons, we conclude that the trial court did not abuse its discretion or otherwise err when it denied Appellant's motion to suppress evidence related to the live-tracking of his cell phone.

### Prior Bad Acts Evidence

■ Next, Appellant challenges the admission of certain prior bad acts evidence. *See* Pa.R.E. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). Specifically, Appellant challenges the admission of evidence deriving from 1) "a traffic stop made on July 5, 2009, by the Maryland State Police where tools, [including a crow bar and a sledge hammer,] were found in the vehicle;" 2) "a traffic stop by Whitpain Township Police in May [of] 2010;" and evidence related to "the Cindy Skylight burglary [in Maryland] on August 12, 2013." Appellant's Brief at 34. This evidence was the subject of pretrial motions filed both by the Commonwealth and Appellant. Appellant contends the court erred in admitting this evidence because, he alleges, it was "prejudicial and inflammatory, and of little probative value." *Id.*

> The admission of evidence is solely within the province of the trial court, and a decision thereto will not be disturbed absent a showing of an abuse of discretion. "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will discretion . . . is abused."

*Commonwealth v. Murray*, 623 Pa. 506, 83 A.3d 137, 155–56 (2013) (internal citations omitted).

Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa. R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact. *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 419 (2008).

*Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 497 (2009).

■■■ Initially, we must address waiver. In Appellant's Rule 1925(b) statement, he alleged the "trial court erred in denying [Appellant]'s pretrial motion to exclude evidence of uncharged misconduct, considered as prior bad acts. The evidence spanned over two years and various jurisdictions and the prejudicial effects of said evidence outweighed any legitimate probative value." Appellant's Pa.R.A.P. 1925(b) statement, 4/8/16, at ¶ 5 (unnumbered pages). As such, Appellant appears to have narrowed his claim as raised below so as to only challenge the court's weighing of the probative versus prejudicial value of the evidence in question, as is required under the second sentence set forth in Rule 404(b)(2) ("In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice."). Appellant's Rule 1925(b) statement does not appear to challenge whether the evidence in question qualified as an exception to Rule 404(b)(1) as set forth under the first sentence of Rule 404(b)(2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). Accordingly, we will review the trial court's balancing of the probative versus prejudicial nature of this evidence, but not, as Appellant argues at times in his brief, the determination that such evidence was relevant to establish Appellant's identity or M.O.,[9] as we conclude that aspect of Appellant's argument has been waived. *See Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 309 (1998) ("Any issues not raised in a 1925(b) statement will be deemed waived."). Accordingly, we proceed with our analysis by assuming the evidence in question met an enumerated exception under Rule 404(b)(2), and consider only the trial court's determination that the evidence was more probative than prejudicial.

The trial court explained its decision as follows:

> While it may seem that the Commonwealth ha[d] an abundance of evidence, it was mostly circumstantial evidence. The specific purpose for which this evidence came in was to give the jury insight into the significance of these circumstances. This evidence tends to reveal (as was the Commonwealth's case) a signature modus operandi (specific types of tools used in each complex burglary).

---

**9.** We note that although the parties and trial court analyzed this matter below as primarily or solely relating to the identity/M.O. exception recognized under Rule 404(b)(2), it appears that this evidence may have been admissible as being relevant to establish opportunity, preparation, and plan, as well. However, because Appellant has waived this aspect of his claim on appeal, we need not analyze it further.

As such the probative value outweighs the potential for prejudice.

Additionally, this [c]ourt gave the following jury instruction:

Also, there was evidence about some other acts involving one or more of the defendants, two or three different episodes that happened prior to this string of burglaries that are before you that you have to decide on.

There was an incident—two incidents in Maryland in 2009 and 2010, one in '09 and one in 2010.

The incident in 2009 involved [Appellant] and Mr. Baker—Troy Baker and [Appellant]. The incident in 2010 presumably involved [Appellant] and Cornelius Smith. And the incident at Cindy's Skylight allegedly involved all three of the defendants. And you'll remember that testimony.

Now, with respect to that, however, there are some—an instruction that goes along with it. Any argument or testimony by the Commonwealth or from members of the Howard County, Maryland police departments or the ROPE team or other Maryland police branches regarding any dossiers or prior investigations into the three defendants or the fact that charges were either never filed or were dismissed and expunged for those matters **is not substantive evidence in this case that any of the crimes charged here today were committed by these defendants.**

It's just a factor you may consider when deciding whether or not it sheds any light on any type of method of operations. It's only for that limited purpose that you may consider that other evidence. ·

[N.T., 2/3/16–2/5/16, at 1961–62.]

This [c]ourt recognized the possible prejudicial impact of admitting the evidence of facts underlying the 2010 incident involving [Appellant], however, we found that the probative value of proving [the] identity of the suspects and a common scheme or *modus operandi* present in the burglaries (tools used) for which [Appellant] was on trial outweighed any prejudice. This [c]ourt properly exercised its discretion by admitting evidence of the factual basis underlying the 2010 incident for the purpose of proving identity and method or modus operandi in the subsequent burglaries.

TCO at 15–16 (emphasis in original).

 Appellant initially argues that the "first two . . . traffic stops" were "not bad acts[,]" and that they occurred "from six . . . to seven . . . years prior" to the conduct that was the subject of the criminal charges in this case. Appellant's Brief at 35. This line of argument is self-defeating; if the two traffic stops in question were not prior bad acts, then they were not excludable under Rule 404(b)(1). Rule 404(b)(1) "prohibits the use of evidence of other crimes, wrongs or acts to prove a person's character." Pa.R.E. 404 (comment). Thus, the risk averted by the rule is that the jury might assume Appellant's bad character from his commission of prior bad acts, and based upon that negative assessment of character, assume guilt without reliance on or sufficient consideration of the specific evidence presented regarding the charged crimes. However, if these prior acts did not tend to establish bad character, because they were not prior bad acts, then the evidence is not excludable under Rule 404(b)(1). In such circumstances, evidence of such acts may be inadmissible under some other rule of evidence (*i.e.*, Rule 403 ("The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, ***confusing***

*the issues, misleading the jury,* undue delay, wasting time, or needlessly presenting cumulative evidence.") (emphasis added)), but Appellant has preserved no such claim for our review.

In any event, even if the prior acts in question were not prior bad acts but still fell within the purview of Rule 404(b)(1), the relative risk of unfair prejudice, as assessed under the second sentence of Rule 404(b)(2), should be low because they were merely *prior* acts rather than *prior bad* acts. It is reasonable to assume that the admission of prior crimes, wrongs, or bad acts carries a greater risk of unfair prejudice than does the admission of innocuous prior conduct.

Appellant makes a similarly unconvincing argument with regard to the admission of evidence related to the Cindy's Skylight burglary, for which Appellant was arrested, but the charges were dismissed. Appellant argues that "[t]hese are not bad acts, they are just acts in and of themselves are not indicative of anything." Appellant's Brief at 36. If the evidence is not indicative of "anything," then it is not indicative of bad character and, therefore, it is not excludable under Rule 404(b)(1); and, if it is not indicative of bad character, then it is not particularly prejudicial. Accordingly, we are wholly unconvinced by Appellant's argument that the trial court abused its

discretion by admitting evidence of these three prior acts on the basis that they did not actually constitute prior bad acts. Based on Appellant's choice of argument, we must conclude that he has failed to demonstrate that this evidence was particularly prejudicial.

As for the probative value of this evidence, the trial court assessed it as being particularly important given the highly circumstantial nature of the Commonwealth's evidence. The Commonwealth had no on-scene identifications by witnesses, nor video surveillance, due in large part to the manner/M.O. of the burglars, who targeted unoccupied structures at night, and disabled all surveillance and alarm equipment, demonstrating a sophisticated operation marked by significant preparation and planning on the part of the perpetrators. It was essential, therefore, for the Commonwealth to demonstrate that Appellant and his cohorts were capable of such operations. The prior acts evidence admitted was highly probative of not just "identity," but also "opportunity, ... preparation, plan, knowledge, ...., absence of mistake, [and] ... lack of accident." Pa. R.E. 404(b)(2).[10] In this context, and given Appellant's failure to establish significant prejudice, we conclude that he has failed to demonstrate the trial court abused its discretion in admitting this evidence.[11]

---

10. Nevertheless, we agree with the trial court this evidence was highly probative identity evidence, and was admissible on that basis alone.

11. We note that we have reviewed the cases cited by Appellant, and find each to be easily distinguishable from the instant matter on the facts. The only case cited by Appellant which was somewhat on point was a trial court opinion with no precedential value. However, that trial court ruled that evidence concerning the defendant's prior burglaries, including the common tools used in each burglary, the removal of security systems, and other evidence similar to that involved in this case, were

admissible to demonstrate identity/M.O. *See Commonwealth v. Ritchey,* 2014 WL 9859709 (Pa. Com. Pl. filed June 17, 2014) (Venango County). Indeed, in the same defendant's appeal from his conviction in that case, this Court ruled (also in an non-precedential decision) that evidence from the defendant's prior burglary conviction *was admissible* under Rule 404(b)(2) to prove the defendant's identity/M.O. *See Commonwealth v. Ritchey,* No. 96 WDA 2014, unpublished memorandum, 2015 WL 7016531 at *1–2 (Pa. Super. filed June 17, 2015). Thus, the most-on-point case cited by Appellant, albeit non-precedential, tends to strongly refute his claim.

## Rule 600

Next, Appellant argues that trial court erred by dismissing his Rule 600 motion, both with respect to case numbers 0036 and 2152. The relevant standard of review for a Rule 600 case is well settled:

When reviewing a trial court's decision in a Rule 600 case, an appellate court will reverse only if the trial court abused its discretion. *See Commonwealth v. Selenski*, 606 Pa. 51, 994 A.2d 1083, 1087 (2010). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will ... discretion is abused." *Id.* (internal citation omitted). Our scope of review is limited to the record evidence from the Rule 600 hearing and the findings of the lower court, viewed in the light most favorable to the prevailing party. *See Id.*

As we have noted previously, this Court adopted Rule 600, and its predecessor Rule 1100, to protect defendants' constitutional rights to a speedy trial under the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution, in response to the United States Supreme Court's decision in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *See Commonwealth v. Meadius*, 582 Pa. 174, 870 A.2d 802, 804 n. 1 (2005). In *Barker*, the United States Supreme Court declined to exercise legislative or rulemaking authority and instead adopted a balancing test to determine whether a defendant's speedy trial rights had been violated. The four part test required consideration of the "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker*, 407 U.S. at 530, 92 S.Ct. 2182. Although finding "no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months," the High Court held that the individual states "are free to prescribe a reasonable period consistent with constitutional standards." *Id.* at 523, 92 S.Ct. 2182.

\* \* \*

We have explained that Rule 600 has the dual purpose of both protecting a defendant's constitutional speedy trial rights and protecting society's right to effective prosecution of criminal cases. *Selenski*, 994 A.2d at 1088; *Commonwealth v. Dixon*, 589 Pa. 28, 907 A.2d 468, 473 (2006). To protect the defendant's speedy trial rights, Rule 600 ultimately provides for the dismissal of charges if the Commonwealth fails to bring the defendant to trial within 365 days of the filing of the complaint (the "mechanical run date"), subject to certain exclusions for delays attributable to the defendant. Pa.R.Crim.P. 600(A)(3), (G). Conversely, to protect society's right to effective prosecution prior to dismissal of charges, "Rule 600 requires the court to consider whether the Commonwealth exercised due diligence, and whether the circumstances occasioning the delay of trial were beyond the Commonwealth's control." *Selenski*, 994 A.2d at 1088. If the Commonwealth exercised due diligence and the delay was beyond the Commonwealth's control, "the motion to dismiss shall be denied." Pa. R.Crim.P. 600(G). The Commonwealth, however, has the burden of demonstrating by a preponderance of the evidence that it exercised due diligence. *See* [*Commonwealth v.*] *Browne*, 526 Pa. 83, 584 A.2d [902,] at 908 [ (1990) ]. As has been oft stated, "due diligence is fact-specific, to be determined case-by-

case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." **Selenski**, 994 A.2d at 1089. "If, at any time, it is determined that the Commonwealth did not exercise due diligence, the court shall dismiss the charges and discharge the defendant." Pa.R.Crim.P. 600(G).

**Commonwealth v. Bradford**, 616 Pa. 122, 46 A.3d 693, 700–702 (2012).

■ At 0036, Appellant claims that the Commonwealth was 131 days late in bringing him to trial, and 496 days that passed from the time of the complaint to the commencement of trial were attributable to the Commonwealth. At 2152, Appellant claims that the Commonwealth was 208 days late in bringing him to trial, and he alleges that 573 days that passed from the time of the complaint to the commencement of trial were attributable to the Commonwealth.

The trial court, after detailing the various delays that occurred in both cases,[12] *see* TCO at 18–19, concludes that "[w]hen all the 'excusable' and/or 'excludable' time is added together, it comes to less than 365 days. As such, the Commonwealth has not violated Rule 600[,]" *id.* at 19. The trial court also indicates that:

In the instant matter, the Commonwealth also exercised, to the best of its ability, due diligence in bringing this complex case to trial. In the interests of judicial economy, there were three defendants tried together, numerous witnesses [who] testified, and countless numbers of exhibits that were introduced at trial. Not all the continuances were on the Commonwealth (as some were due to this Court's availability and the other Defendants['] requesting continuances). After taking into consideration any "excusable delay" and time in which this Court was considering all the Motions filed by [Appellant], there was no misconduct on behalf of the Commonwealth in bringing this case to trial in a timely manner.

*Id.*

Turning to Appellant's brief, we find his presentation of this issue to be confusing and disjointed. At no point does he specifically identify where his view of the various delays that occurred in these cases conflicts with the ruling of the trial court on his Rule 600 motion. Appellant merely states the various delays which did occur, and baldly asserts that many or most of them were exclusively attributable to the Commonwealth. This makes the task of merely identifying the nature of the specific court error at issue nearly impossible. Appellant also fails to direct our attention to any adverse determination made by the trial court at the Rule 600 hearing. Which delay did the trial court erroneously fail to attribute to the Commonwealth? Reading Appellant's brief provides no clear answer to this critical question.

Moreover, apart from citing boilerplate Rule 600 law, Appellant fails to compare and contrast any particular delay-attribution decision made by the trial court with existing case law. Appellant also provides virtually no analysis of the Commonwealth's exercise of due diligence, or lack thereof, beyond simply noting that the Commonwealth failed to file a brief on one occasion during the pretrial process, thereby delaying a particular court ruling.

After reviewing Appellant's brief and the trial court's facially reasonable analysis, we conclude that Appellant has simply

---

12. The trial court indicates that the procedural history for each case was identical following Appellant's May 7, 2014 arraignment.

failed to adequately identify the particular excludable/excusable time determinations made by the trial court which purportedly led to the court's abusing its discretion in denying his Rule 600 motion. Appellant's failure to adequately develop his argument results in waiver of this issue. *See* Pa. R.A.P. 2119; *Commonwealth v. Rhodes,* 54 A.3d 908, 915 (Pa. Super. 2012) (failure to adequately develop argument results in waiver); *Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007) ("The failure to develop an adequate argument in an appellate brief may result in waiver of the claim under Pa.R.A.P. 2119."); *see also Commonwealth v. Freeman*, 128 A.3d 1231, 1249 (Pa. Super. 2015) ("While this Court may overlook minor defects or omissions in an appellant's brief, we will not act as his or her appellate counsel.").

### Prosecutorial Misconduct

▮ Appellant next presents two claims alleging prosecutorial misconduct. Appellant contends that the prosecutor 1) averred prior bad acts during opening arguments that were outside the scope of the trial court deemed admissible in its pre-trial ruling; and 2) mischaracterized the testimony of a Commonwealth expert witness during closing arguments. Appellant asserts that he requested and denied a mistrial on each occasion.

In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interest but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, … assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with [the] law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Commonwealth v. Lettau*, 955 A.2d 360, 363 (Pa. Super. 2008) (internal citations and quotation marks omitted) *rev'd on other grounds*, 604 Pa. 437, 986 A.2d 114 (2009). Thus, we review the trial court's determination that a new trial was warranted due to prosecutorial misconduct for abuse of discretion. We cannot reverse that judgment unless it is clear that the trial court misapplied the law or acted unreasonably in the exercise of its discretion.

*Commonwealth v. Culver*, 51 A.3d 866, 871 (Pa. Super. 2012). Importantly, "[i]t is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted." *Commonwealth v. Melvin*, 103 A.3d 1, 26 (Pa. Super. 2014) (quoting *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 729 (1998)).

▮ Appellant's first prosecutorial misconduct claim involves a statement by the prosecutor regarding the nature of the ROPE team's law enforcement purpose. As is evident from the name itself (which,

as noted previously, stands for 'Repeat Offender Proactive Enforcement'), the ROPE team proactively tracks *repeat offenders.* At the August 26, 2014 pretrial hearing, Appellant objected when Officer Kreller testified that Appellant and his co-defendants were on the ROPE team's radar already when the investigation into the Cindy Skylight Liquors began in Maryland. At that time, the Commonwealth indicated that it did not intend "to [e]llicit any of this testimony at trial[,]" but had solicited it only to establish the officer's state of mind for purposes of litigating the suppression issues related to the purported MPJA and Wiretap violations. N.T. Suppression Hearing at 94. The trial court responded, "I understand. Very well." *Id.*

In the prosecutor's opening statements at trial, however, he described the ROPE team as "a proactive enforcement team funded by the county down there who keeps dossiers of people who may have prior circumstances that might mirror these situations." N.T., 1/22/16, at 49. No contemporaneous objection or request for a mistrial appears on the record at the time the prosecutor made this comment. However, Appellant did issue an objection to the statement immediately after the prosecutor's opening statement ended, and requested a mistrial on the basis that the prosecutor was alluding to prior bad acts that were not held admissible in pre-trial rulings. *Id.* at 56. The trial court then denied the motion. *Id.* at 58.

Notably, although Appellant identifies the Commonwealth's assertion/promise at the pre-trial hearing, he does not direct this Court's attention to where in the record the trial court issued an order excluding, explicitly or implicitly, the content of the contested statement, when he contends that this information "fell outside the scope the 404[(]b[)] ] ruling." Appellant's Brief at 46. Nevertheless, it is clear that the Commonwealth was at least violating the spirit of its prior commitment to the trial court, and we therefore assume the prosecutor engaged in misconduct to some extent when he alluded to the fact that the ROPE team's focus was on persons with prior criminal records or, at least, persons suspected of prior crimes not at issue in this case.

Thus, we turn our attention to whether Appellant was prejudiced by the Commonwealth's comment to an extent that it deprived him of a fair trial. Appellant argues that he

was prejudiced by the impression this left with the jury. Appellant was charged with eight (8) burglaries that were committed without an eye witness. The impression left by the prosecutor was that [A]ppellant was a repeat criminal offender creating a hostility and extreme bias. Appellant was prejudiced beyond repair and a mistrial should have been granted.

Appellant's Brief at 47. Appellant provides no case law to support his analysis of the degree to which he was prejudiced by the prosecutor's brief description of the ROPE team's duties.

In addressing this issue, the trial court largely relies on its analysis of Appellant's other prior bad acts claims. Essentially, the court contends that whatever prejudice Appellant suffered was adequately addressed by the court's prior bad acts instruction that it had issued at the close of trial, and that the jury's verdict, which had acquitted Appellant of half of the charged burglaries, demonstrated that whatever prejudice he had suffered was not so great as to deprive him of a fair trial. TCO at 22.

█ We recognize that:

[N]ot every intemperate or uncalled for remark by the prosecutor requires a new trial.

As we have stated many times: [C]omments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. D'Amato*, 514 Pa. 471, 526 A.2d 300, 309 (1987) (internal citations and quotation marks omitted).

Although the trial court's analysis is somewhat limited, it is essentially correct and virtually left unassailed by Appellant's bald assertions of irreparable harm. The prosecutor's comment was brief and it did not refer directly to Appellant, to Appellant's prior record, or to any specific prior bad acts at all; at worst, it raised some suspicion that Appellant was previously known to the ROPE team. Given the admission of far more specific prior bad acts evidence at Appellant's trial, discussed above, the prosecutor's comment could not possibly have affected the jury's verdict in any significant degree. Moreover, we agree with the trial court that its prior bad acts instruction at the end of Appellant's trial would have further mitigated any residual prejudice from the prosecutor's remark, and that the jury's mixed verdict was itself some evidence that the jury was capable of parsing the evidence fairly despite that remark. Accordingly, we conclude that whatever prejudice that resulted from the prosecutor's remark was minimal and, therefore, that the trial court did not abuse its discretion when it denied Appellant's motion for a mistrial.

■ Next, Appellant asserts that a comment by the prosecutor made during closing arguments, regarding the testimony of Nicholas Plumley, constituted prosecutorial misconduct warranting a mistrial. Plumley, "a forensic scientist with the Pennsylvania State Police Bureau of Forensic Sciences, testified as to evidence collected and how it related to each burglary." TCO at 22. Part of his testimony included his conclusion that orange and green paint discovered on a crowbar that was found in the vehicle that Appellant was in at the time of his arrest was *consistent* with paint chips recovered from the Barr's Exxon crime scene. See N.T., 2/3/16–2/5/16, at 1786 (emphasis added). Specifically, Plumley testified that, after performing multiple tests, he was "not able to distinguish between the two paint samples." *Id.*

During the Commonwealth's closing argument, however, the prosecutor told the jury that the paint from the crow bar "matched" the paint on the safe from the Barr's Exxon crime scene. *Id.* at 1916. Appellant's codefendant's counsel objected,[13] and the prosecutor immediately offered to clarify his statement, which the trial court encouraged him to do. The prosecutor then told the jury:

When I say match—that's actually literally the next sentence I was going to is get to—when I say match, I don't mean match like there's one color that's pretty similar.

I'm not going to say match like it may kind of be the same thing or even chemically consistent because chemically consistent could be a lot of things, you get paint from a lot of places—you get tools from a lot of places. But what Mr. Plumley said is important that it is not just the blue paint, that it is multiple layers of paint that he was able to get from the

---

**13.** There is no indication in the record that Appellant's counsel joined in that objection at the time it was made.

safe and from the shavings that matched on many layers—on at least two layers to the Sawzall.

And what's important about that is Mr. Plumley throughout his eight years of experience has never seen it. He's never seen something that specific tying a tool to a piece of trace evidence.

When I say match, I don't mean beyond a reasonable doubt match. What I mean is corroborative of the remaining evidence that you have in this case. And it's forensic evidence. So beating the drum there's no evidence, there's no evidence, yeah, there is. Yes, there literally is.

*Id.* at 1916–17.

Neither Appellant nor his co-defendants immediately reissued an objection following the prosecutor's clarification. However, at the end of the Commonwealth's argument, Appellant's counsel stated:

Then I guess the only thing I want to follow up on would just be with Ms. Gross' objection that I join in on as [the prosecutor] indicating [a] match a couple of times regarding—I still don't think that [it] was clear—he said, oh, my next sentence was I was going to clear that up and [he] never did.

I mean, his expert can say it could be from the same common origin, he says it's consistent with. Specifically he could not say it's a match. And I think that is extremely misleading for the Commonwealth to use the term match numerous times throughout their closing in reference to that type of evidence.

I would ask that when going over expert witness and what he was that there be something that just says exactly what the witness said, that he says it comes from the same common—or could come from the same common origin or is consistent and that's what the expert— and everything else is for them to deter-

mine what weight to give that. But the way that it stands now, I think it creates an issue.

*Id.* at 1229–30.

First, we ascertain nothing from the record which indicates that a mistrial was requested on the basis of these objections. Accordingly, the claim that the trial court abused its discretion by failing to grant a mistrial on that basis has been waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). In any event, were we to reach that issue, we would still conclude that it is meritless.

As noted above, Appellant did join, after some delay, the prior objection by Appellant's co-defendant's counsel at the end of the Commonwealth's closing argument. As is clear from the above passage, Appellant requested a specific curative instruction. And, in fact, the trial court ultimately issued such an instruction:

Now, one of the witnesses, the last expert that testified, the trace expert, the last witnesses that testified earlier today, the words "match" and "consistency" were sort of used interchangeably back and forth.

I just wanted to make it clear, my understanding of the testimony is that the expert was saying he was able to render an opinion that certain things were consistent with that particular tool or that particular implement or something along that line.

It's not the type of science where he can say it's a match like a fingerprint, that only one person has that fingerprint. It was simply his testimony ... that it was consistent. And you, the jury, may certainly consider that together with all the other evidence in this case.

*Id.* at 1960–61.

Appellant does not direct our attention to where in the record he objected to the

court's instruction, an instruction which was given pursuant to his own request. Indeed, in his brief, Appellant does not even discuss the curative instruction at all, let alone the prosecutor's clarification.[14]

■ We note that the "jury is presumed to have followed the court's instructions." *Commonwealth v. Chmiel*, 612 Pa. 333, 30 A.3d 1111, 1147 (2011) (quoting *Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 632 (2010)). Thus, we presume the jury followed the trial court's instruction in this case regarding the prosecutor's comments about Plumley's testimony. Moreover, Appellant's failure to object to the instruction "indicated his satisfaction with the instruction." *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 504 (1995). Accordingly, we would find no merit to the claim that the trial court abuse its discretion by failing to grant a mistrial based on the prosecutor's comment during closing arguments, even had that claim been preserved for our review.

■ Finally, Appellant contends that the trial court abused its discretion by denying his request for a mistrial after the following exchange occurred between the prosecutor and Officer Kreller:

Q: Okay, so let's go back to 2013 and talk about how this whole thing started. Were you involved in investigating these individuals prior to the Cindy's Skylight burglary?

A: Yes.

Q: As far as the reference from Detective Guilfoyle, is that what brought all of the court orders and all that kind of thing together?

A: Yes.

N.T., 1/28/16 at 951.

■ Appellant complains that, again, this exchange violated the pretrial order limiting Pa.R.E. 404(b) evidence. However, no objection was issued by Appellant at the time this exchange occurred. *Id.* After Officer Kreller completed his testimony, Appellant's co-defendant issued an objection to Officer Kreller's testimony on this basis and motioned for a mistrial, at which point Appellant joined the objection and request for a mistrial. *Id.* at 956. However,

[t]he failure to raise a contemporaneous objection to a ... comment at trial waives any claim of error arising from the comment. *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 423 (2008) (citing Pa.R.A.P. 302(a), which states that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

*Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282, 293 (2010).

■ While there is often some leeway provided with this rule with regard to opening and closing statements, where, by custom, it often preferred to reserve objections until the end of such statements,[15] no such custom exists with regard to an objection made during the course of routine testimony. Here, Appellant's objection and request for a mistrial was not contemporaneous to the questions and answers on which it was premised. Moreover, Appellant provides no explanation of why the contemporaneous objection requirement was not reasonable under these circum-

---

14. We observe that the prosecutor's clarification, read in its entirely, largely dovetails with the content of the trial court's curative instruction. When making the delayed objection at trial, Appellant's counsel appears to have only considered the first few sentences of the prosecutor's clarification.

15. Indeed, such leeway was provided above with respect to Appellant's first prosecutorial misconduct claim.

stances. Accordingly, we deem Appellant's final claim to be waived.

Judgment of sentence **affirmed**.