J-A24041-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JOSE LUIS LEON :
:
Appellant : No. 28 EDA 2023

Appeal from the Judgment of Sentence Entered August 31, 2022
In the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0000087-2022

BEFORE: STABILE, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED OCTOBER 16, 2024**

Jose Luis Leon ("Leon") appeals from the judgment of sentence imposed following his convictions for, *inter alia*, first-degree murder and aggravated assault of a police officer.[1] We affirm.

Leon's convictions arise from his stabbing and killing of Elson Aviles ("Mr. Aviles") and subsequent altercation with police while in custody. The Commonwealth filed a single information listing charges related to the stabbing of Mr. Aviles and the altercation with police, and Leon filed a pretrial motion to sever the charges, which the trial court denied. Leon proceeded to a consolidated jury trial on all charges. We reproduce the trial court's thorough summary of the trial evidence:

> During the morning of October 7, 2021, [Mr. Aviles] and his friend, . . . Leon, spent some time together at Mr. Aviles['s] home,

---

[1] *See* 18 Pa.C.S.A. §§ 2502(a), 2702(a)(3).

and made plans to see one another again that evening. The two also exchanged messages relating to a drug transaction between them and a third person. In the late evening hours [that same day], Mr. Aviles texted Carmen Rosario [("Ms. Rosario")], his girlfriend, and asked her if she would like to go out. They decided to go to the Wind Creek [C]asino [("the casino")] in Bethlehem, and [Mr. Aviles and Leon] picked her up shortly thereafter in a [Nissan] driven by Mr. Aviles [("the Nissan")[2]]. It was nearly 11:00 p.m. at this point. After a brief stop back at Mr. Aviles'[s] home at [Leon's] request, the three stopped at Wawa and then arrived at the casino. Within a few minutes, [Leon] requested that Mr. Aviles give him his car keys, stating that he forgot something out in the [Nissan]. [Leon] did not return for over [ninety] minutes.

Once it became apparent to Ms. Rosario and Mr. Aviles that [Leon] was not returning, they called and texted him repeatedly in order to find out what was going on. When [Leon] finally returned to the casino, [he] drove erratically in circles through the parking lot[, and by Ms. Rosario and Mr. Aviles, who were standing outside]. Eventually, he stopped and got into the back seat of the car while Mr. Aviles got in the driver['s] seat and Ms. Rosario got in the passenger seat. [Leon] told Mr. Aviles to drop Ms. Rosario at home and that he needed Mr. Aviles to drive him somewhere. Shortly after Ms. Rosario was back in her home, she heard screaming from outside that sounded like Mr. Aviles'[s] voice. She texted him to ask if he was okay[,] but he did not respond. At trial, the jury was shown video surveillance footage of the events at the casino, including Mr. Aviles and Ms. Rosario spending time gambling in the casino and waiting outside for [Leon], as well as [Leon] driving erratically through the parking lot.

During the course of the investigation in this case, officers recovered multiple cellular phones from inside the [Nissan] and performed forensic investigations of those phones. Two of those phones were determined to belong to [Leon]. Using cell site location information, police were able to determine that after he left the casino in [the Nissan] . . ., [Leon] was driving around the greater Bethlehem area. [Leon] admitted in his own trial testimony that after he took the [Nissan] and left the casino, he drove to Saucon Park to stash a quantity of drugs there. While

---

[2] The Nissan was owned by Mr. Aviles's other girlfriend, Terri Ellison ("Ms. Ellison") with whom Mr. Aviles lived.

[Leon] was driving around the area during this time, Mr. Aviles called [Leon fifty-five] times, and Ms. Rosario called him five times. The vast majority of these calls were unanswered. Mr. Aviles also sent [Leon] multiple text messages, imploring him to return the [Nissan], and indicating that [Ms. Ellison, the owner of the Nissan,] would be upset if anything happened to the [Nissan] . . .. Mr. Aviles did not threaten [Leon], but said that he would call the cops if [Leon] did not return soon with the [Nissan].

Shortly before 1:00 a.m. on October 8, 2021, Officer Brian Kovacs and Officer Jonathan Ezzo of the City of Bethlehem Police Department were on patrol in their vehicle and stopped at a red light when their attention was drawn to a person loudly moaning down the intersecting street. They observed two men in the street, one of whom was soaked in blood and who fell to the ground. That person was later identified as [Mr.] Aviles. The other person wa[ved] the officers down. He was later identified as [Leon]. [Leon] was holding a large kitchen knife, which he dropped upon . . . command. That knife was later determined to have come from Mr. Aviles'[s] home. [Leon] denied stabbing Mr. Aviles, but he refused to answer officers' questions about what had happened, insisting that they ask Mr. Aviles. No other weapons were found, either in the immediate area or on [Leon or Mr. Aviles]. [Leon] was eventually taken into custody at the scene. He was observed to have blood on his hands at this time. He was also subjected to a pat down search . . ., which revealed a plastic bag on his person that contained suspected drugs. These drugs were later tested and determined to be cocaine and methamphetamine. [Leon] stipulated to the authenticity of these drug identification tests.

Officers Kovacs and Ezzo, as well as others who arrived on scene shortly thereafter, provided aid to Mr. Aviles. While rendering aid, they asked Mr. Aviles repeatedly who had stabbed him, and on each occasion he indicated that [Leon] had stabbed him. Mr. Aviles also mentioned a car crash while speaking to officers at the scene. Mr. Aviles was taken to the hospital, where he later died of his injuries.

On autopsy, Mr. Aviles was found [to] have [twelve] stab wounds to his neck, back, and upper extremities. Three of the wounds were to his back near his scapulae, at a depth ranging from 1.25 inches to 5 inches. Four of the wounds were to his chest. Of those four wounds, which ranged in depth from 0.75 inches to 5.125 inches, one severed his right axillary artery.

- 3 -

Another was of such a nature as to indicate twisting and pulling of the knife at the time of the stabbing. Mr. Aviles suffered three stab wounds to his right upper arm, ranging in depth from 0.75 inches to 3.25 inches. Finally, Mr. Aviles had two stab wounds to his neck, severing his jugular vein, subclavian vein and carotid artery. These wounds ranged in depth from 4.75 inches to 5.375 inches. One of the stab wounds punctured Mr. Aviles'[s] lung. The forensic pathologist who performed the autopsy concluded that [Mr.] Aviles died by homicide after multiple stab wounds. While none of the wounds would have been immediately fatal and would have allowed Mr. Aviles to walk, powered by adrenaline, the significant blood loss occasioned by the wounds led to his death.

During the course of the investigation, officers followed a blood trail that led them from the area where Mr. Aviles had fallen in the street, down several blocks in the neighborhood, to a single-vehicle crash into a telephone pole at Hill and Mechanic Streets in the City of Bethlehem. No persons were present in the area. Officers also observed blood inside the [Nissan], particularly in the front seat.

* * * *

Officers canvassed the neighborhood on the morning of October 8, 202[1], and were able to obtain video footage from multiple home surveillance cameras, including a Ring doorbell camera. One gentleman who lives in the neighborhood was smoking a cigarette at his window at the time of this incident, just before officers arrived on scene. He told police that he observed two men walking down the sidewalk, one following the other. The man in front was heard to call out for help, telling the other man to get away, and accusing the other of stabbing him, which the latter denied. The jury was shown three videos from home surveillance cameras, including one depicting the two men as described by this witness. The jury was also shown video footage from a City of Bethlehem surveillance camera, which depicted the two men travelling down the street as described.

Evidence was also introduced regarding [Leon's] behavior at the police station after his arrest. Upon arrival at the station, [Leon] indicated to Officer Stephen Brailo [("Officer Brailo")] that he needed to urinate, and was told that he could not do so at that time. Officer Brailo needed to first complete intake, including a strip search, and wanted to preserve any evidence that might be on [Leon's] hands before letting him use the restroom. [Leon]

- 4 -

was insistent and moved to urinate in the corner of the intake room. At that time, Sergeant Bradford Jones [("Sergeant Jones")] moved to restrain [Leon] to prevent him from urinating in the intake room[,] and [Leon] resisted, thrashing and throwing punches. Officer Brailo was struck twice in the head. Sergeant Jones was also struck in the face. [After subduing Leon, officers sat him down on a chair. Later, Officer Brailo noticed blood on the chair. Additionally, Officer Brailo discovered blood in the police vehicle used to transport Leon to the station. Both the blood from the vehicle and the chair were tested for DNA along with other blood samples from the scene and on Leon].

For his part, [Leon, at trial, did] not deny that he stabbed [Mr.] Aviles. However, [Leon] contend[ed] that he did so in self-defense. On the fourth day of trial, [Leon] offered his own testimony in support [of] this defense. He indicated that Mr. Aviles was his best friend, and that the two had lived together at one point. With respect to the events of October 7, 2021 and October 8, 2021, [Leon] testified that Mr. Aviles had seemed in a bad mood all day that day [and was drinking], from the time they spoke in the morning. He agreed with the Commonwealth's witnesses that he and Mr. Aviles picked up Ms. Rosario and went to the casino, where he asked Mr. Aviles for the car keys and then left for a period of time. [Leon] testified that he had drugs in the [Nissan] and was paranoid that Mr. Aviles was trying to set [him up] somehow, so he wanted to stash the drugs somewhere and did so in Saucon Park.

[Leon] testified that[, when he returned to the casino,] Mr. Aviles was angry about him taking the [Nissan], and that after they dropped Ms. Rosario off at home—which [Leon] had asked Mr. Aviles to do because he did not want her around for a drug transaction that the men were going to engage in—Mr. Aviles yelled at him, and was furious. [Leon] contended that Mr. Aviles then stopped the car, and pulled out a knife. [Leon] testified that he was in the back seat and that Mr. Aviles was in the front seat, with the knife in his left hand, and that Mr. Aviles turned his body to the right, facing the back seat, thrusting the knife at [Leon]. [Leon] then claimed that, without getting cut he was able to grab the knife from Mr. Aviles, disarming him. He then stabbed Mr. Aviles several times. [Leon] stated that Mr. Aviles exited [the Nissan], . . . [Leon] exited . . . after him, and . . . the [Nissan] then rolled away. [Leon] testified that he followed Mr. Aviles out of the [Nissan] because he felt bad for stabbing him and felt that he was no longer in danger. It did not occur to him to attempt to

retreat after disarming Mr. Aviles. [Leon] admitted that he did not attempt to seek assistance []or medical attention from anyone in the neighborhood while following Mr. Aviles, but contended that he flagged down the police. He admitted that he did not tell police on October 8, 2021[,] that he had stabbed Mr. Aviles, or that he had done so in self-defense. He admitted that he told his then-girlfriend Jessa [("Jessa")] on a recorded prison phone call that he had not acted in self-defense. A recording of that call was played for the jury. [Leon] contended that this statement to Jessa was a lie, because he was concerned she would view him poorly and would break up with him. With respect to his behavior with the officers at the police station, [Leon] testified that he was in shock as a result of what had happened that night, that he badly needed to urinate, and that he flailed around in an upset state because he wanted to urinate and wasn't being allowed to by the police, who had grabbed him by the neck to prevent him from urinating in the corner of the room.

Order, 12/14/22, 4-12 (record citations omitted).

We add that during trial, Leon sought to present, as evidence of Mr. Aviles's state of mind, Mr. Aviles's text messages to Ms. Rosario hours before the stabbing ("the texts").[3] The trial court excluded the texts on relevancy

_____

[3] Leon reproduces, verbatim, the texts relevant to this appeal:

- So i wana tell u something i get mentally abused everyday and like im really over it so when i deal w other stress its bad for me cuz my patience ya kno so when i kno i am right or not doing something wrong I wont feed into things or i will fall back u feel me like i kno i be w u alot and when im not i deal w hell (Message #26, 10/7/21, at 10:46 a.m.)

- Ma bad not for u [in reference to a text to Leon] lol my boi got me tight (Message #63, 10/7/21, at 1:02 P.M.)

- He [Leon] lost his car key (Message #65, 10/7/21, at 1:02 p.m.)

*(Footnote Continued Next Page)*

grounds, concluding they were too remote to the time of the killing and Mr. Aviles's agitation was not related to Leon. The trial court noted the texts suggested Mr. Aviles was angry and stressed earlier in the day over his mother's cancer diagnosis and the tensions in his relationship with Ms. Ellison. *See* N.T., 8/4/22, at 66-67. However, the court determined there were no indications that Mr. Aviles expressed any ill-will toward Leon or was still angry and stressed before going out with Ms. Rosario and Leon. *See* N.T., 8/4/22, at 67-69.

The jury found Leon guilty of the above-stated offenses, and the trial court sentenced him to an aggregate term of life plus seventy-six to 192 months of imprisonment. Leon timely filed post-sentence motions, which the court denied. Leon timely appealed, and both he and the trial court complied with Pa.R.A.P. 1925.

---

- I jus found out my mom got cancer smh (Message #76, 10/7/21, at 2:47)

- Im so madd (Message #78, 10/7/21, at 2:47 p.m.)

- Ima flip today (Message #79, 10/7/21, at 2:47 p.m.)

- Im so sad and mad im gonna fuckin flip shit (Message #81, 10/7/21, at 2:48 p.m.)

- Im gonna fuckin flip (Message #90, 10/7/21, at 2:54 p.m.)

- Im so fuxkin mad (Message #94, 10/7/21, at 2:55 p.m.)

- Ahh nice i feel so much better i slept (Message #123, 10/7/21, at 6:20 P.M.)

Leon's Brief at 19-20, 23.

Leon raises the following issues, which we have reordered for review:

1. Did the Commonwealth fail to disprove beyond a reasonable doubt [Leon's] claim of self-defense as it related to the conviction for first-degree murder?

2. Did the trial court err and abuse its discretion when it precluded the admission of [the texts] which were sent within eighteen (18) hours leading up the homicide, and which established [Mr. Aviles's] state of mind on the date in question?

3. Did the trial court err and abuse its discretion when it denied [Leon's] motion to sever for trial the charges of aggravated assault [involving the police officers] from the remaining charges?

Leon's Brief at 7 (reordered).

Leon's first challenge implicates the sufficiency of the evidence to convict him of first-degree murder. The following standards govern our review:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt.

***Commonwealth v. Williams***, 176 A.3d 298, 305-06 (Pa. Super. 2017) (citations and quotation marks omitted).

"To convict a defendant of first[-]degree murder, the Commonwealth must prove: a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill." ***Commonwealth v. Houser***, 18 A.3d 1128, 1133 (Pa. 2011) (citations and quotation marks omitted). Where evidence shows that the

defendant acted in self-defense, the Commonwealth bears the burden of disproving self-defense. ***See Commonwealth v. Mouzon***, 53 A.3d 738, 740 (Pa. 2012). Self-defense is at issue where the defendant: (1) "reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm;" (2) "was free from fault in provoking the difficulty which culminated in the slaying;" and (3) "did not violate any duty to retreat." ***Id***. (citations and quotation marks omitted). The Commonwealth may disprove self-defense by showing, beyond a reasonable doubt, that: (1) the defendant was not free from fault in provoking or continuing the difficulty which resulted in the slaying; (2) the defendant did not reasonably believe that he was in imminent danger of death or great bodily harm, and it was necessary to kill in order to save himself therefrom; or (3) the defendant violated a duty to retreat or avoid the danger. ***See Williams***, 176 A.3d at 309.

Leon claims that the Commonwealth failed to disprove self-defense. Leon's Brief at 37. He notes that his trial testimony demonstrated Mr. Aviles suddenly became furious, pulled the knife which came from Mr. Aviles's kitchen, and attacked him first. ***See id***. at 39. Leon contends he reasonably believed he was in danger of death or serious bodily injury because he was aware that Mr. Aviles had been in a bad mood and drinking throughout the day, Mr. Aviles called him fifty-five times after Leon left the casino in the Nissan, and Mr. Aviles became enraged when Leon canceled the drug deal they had previously arranged. ***See id***. at 38. Leon asserts that he did not

violate a duty to retreat. *See id*. at 39. Furthermore, Leon argues that "the Commonwealth did not disprove [his] testimony that the entire incident happened within a short period of time" because there were "no eyewitnesses to the incident." *Id*. at 39. He adds there was no evidence that he stabbed Mr. Aviles after they exited the Nissan, when he believed Mr. Aviles no longer posed a threat. *See id*.

The trial court concluded that "the Commonwealth clearly proved beyond a reasonable doubt that [Leon] did not reasonably believe he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against Mr. Aviles prevent such harm." Order, 12/14/22, at 12. The court noted Leon's initial denials that he stabbed Mr. Aviles and the fact that Leon stabbed Mr. Aviles twelve times provided proper bases to find Leon had not acted in self-defense. *See id*.

Following our review, we conclude Leon's sufficiency of the evidence claim lacks merit. Although Leon testified at trial that Mr. Aviles was the aggressor, the Commonwealth countered that testimony with evidence that Leon repeatedly denied either stabbing Mr. Aviles or even stabbing Mr. Aviles in self-defense. *See* N.T., 8/1/22, at 134; N.T. 8/4/22, at 55-57. This included Leon's prison phone call to his girlfriend, Jessa, when Leon *twice* denied stabbing Mr. Aviles in self-defense. Specifically, Jessa suggested that Mr. Aviles was "probably coming at [Leon] with something[,]" and Leon responded, "Nah, he wasn't coming at me." N.T., 8/4/22, at 60. Later in the same call, Jessa stated, "It's self-defense if anything[,]" and Leon answered

"Nah, that ain't -- nah, it ain't self-defense." *Id*. Thus, Leon's own prior statements rebutted his trial testimony that Mr. Aviles was the aggressor and Leon acted in self-defense.

Furthermore, even if Mr. Aviles were the aggressor, the Commonwealth presented ample evidence that the killing was wholly disproportionate to the threat Mr. Aviles posed. Mr. Aviles was in the driver's seat of the Nissan and Leon was in the back seat when Mr. Aviles would have turned around and pulled the knife. *See* N.T., 8/4/22, at 26, 35, 37. Leon's testimony suggested he quickly disarmed Mr. Aviles without suffering any injuries but began stabbing Mr. Aviles. *See id*. at 27, 38-40. The uncontradicted evidence demonstrated that Leon stabbed Mr. Aviles *twelve* times (including three times in the back), suffered no injuries, did not attempt to call out for help when following Mr. Aviles on the street, and then denied the stabbing to Mr. Aviles and the police. *See id*. at 28-29, 41, 52-53, 55. Therefore, Leon used more force than necessary to protect himself. *Cf. Commonwealth v. Truong*, 36 A.3d 592, 599 (Pa. Super. 2012) (*en banc*) (concluding that the Commonwealth negated a self-defense claim where the defendant used more force than necessary to protect himself; the evidence there established Truong stabbed the smaller victim nineteen times on the front, back, and torso, the victim would have been dazed by a blow to the head, Truong suffered only a small cut to his hand, and Truong denied stabbing the victim when police arrived).

For these reasons, we conclude that the Commonwealth disproved Leon's claim of self-defense beyond a reasonable doubt. Thus, Leon's issue challenging the sufficiency of the evidence fails.

In his second issue, Leon asserts that the trial court abused its discretion by excluding the texts he offered as evidence of Mr. Aviles's state of mind.

Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and an appellate court will only reverse an evidentiary ruling for an abuse of the discretion. *See Commonwealth v. Fitzpatrick*, 255 A.3d 452, 471 (Pa. 2021). The appellant carries a heavy burden to demonstrate that the trial court abused its discretion and cannot simply persuade an appellate court to reach a different conclusion. *See Commonwealth v. DiStefano*, 265 A.3d 290, 297 (Pa. 2021). "An appellate court will not find an abuse of discretion based on a mere error of judgment, but rather . . . where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id*. at 298 (citation and quotation marks omitted).

Evidence is admissible only if it is relevant. *See* Pa.R.E. 402. Evidence is relevant if it has any tendency to make a material fact more or less probable than the fact would be without the evidence. *See* Pa.R.E. 401. Generally, a victim's state of mind is irrelevant in a criminal case, but there are narrow exceptions to this rule. *See Fitzpatrick*, 255 A.3d at 474. One recognized exception exists when the defendant claims self-defense. *See id*.

Where self-defense is at issue, evidence such as the victim's propensity or character for violence, may be relevant to the reasonableness of the defendant's belief that his life was in danger and/or whether the victim was the aggressor. *See Commonwealth v. Lehman*, 275 A.3d 513, 519 (Pa. Super. 2022), *appeal denied*, 286 A.3d 213 (Pa. 2022).[4] Where proffered evidence implicates the defendant's alleged reasonable belief that his life was in danger, the defendant must have knowledge of such evidence. *See id*. at 519 (noting that "if the accused has no knowledge of the victim's prior criminal record, he cannot seek admission of the record for purpose of showing the reasonableness of his fear[,]" and further concluding that, without a foundation that the defendant had knowledge of the victim's violent music videos, the defendant could not admit the videos to establish his fear of the victim). If the evidence tends to show that the victim was the aggressor, then the defendant's awareness of that evidence is less critical; however, the evidence "must be similar in nature and not too distant in time" from the

---

[4] There is little case law on the relevance of a victim's state of mind to support a claim of self-defense. Reported decisions tend to discuss proffers of a victim's fear of the defendant as relevant to rebut a claim that the victim acted as the aggressor. *See generally Fitzpatrick*, 255 A.3d at 474 (quoting *United States v. Brown*, 490 F.2d 758, 767 (D.C. Cir. 1973)). However, the relevance of a victim's state of mind appears analogous to other evidence offered to support a self-defense claim, such as the victim's propensity or character for violence.

We additionally note that, because the texts were Mr. Aviles's out-of-court statements, there were also possible hearsay issues with this evidence. However, since the trial court determined the text messages were not relevant, we address the threshold issue of relevance first.

incident at issue. *Id*. (noting that a violent music video may be admitted where there are adequate similarities between the video and the incident at issue).

Leon argues the trial court erred in excluding the texts that showed Mr. Aviles was in an "angry and volatile emotional state[] in the hours leading up to the homicide," which would have explained why Mr. Aviles "quickly became angry and aggressive," or otherwise "snapped," before attacking Leon with the knife. Leon's Brief at 19, 31, 34. He contends the texts were relevant because they made it more likely he was in reasonable fear of Mr. Aviles and Mr. Aviles was the first aggressor. *See id*. at 29. Leon further argues that the trial court deprived the jury of a complete picture of Mr. Aviles's state of mind and propensity for violence and aggression. *See id*. at 30. He notes that the texts would have corroborated the other evidence that Mr. Aviles was becoming angry and irrational when he called Leon fifty-five times after Leon had left the casino in the Nissan. *See id*. He adds that the texts would also bolster his own testimony, which otherwise appeared to the jury to be self-serving. *Id*. at 31. Leon concludes that the trial court abused its discretion by finding that Mr. Aviles "had 'cooled off' by the time he went to the casino" and thereby substituted its own judgment for that of the jury. *Id*. at 34 and n.5.

The trial court, as noted above, concluded that the texts were irrelevant because they did not concern Mr. Aviles's state of mind at or near the time of the killing and did not express any threat or hostility toward Leon. **See** Trial

Court Opinion, 1/18/23, at 5. The court observed that the texts, which Mr. Aviles sent before 3:00 p.m., suggested Mr. Aviles's anger and stress involved his live-in girlfriend and his mother's cancer diagnosis earlier in the day. *See id*. at 4 (citing N.T., 8/4/22, at 66-69). The court further reasoned that by 6:30 p.m. that evening, Mr. Aviles's text messages suggested he had taken a nap, was in a better mood, and was no longer angry. *See id*. Mr. Aviles, the court continued, exhibited no outward indications that he was still stressed or angry, when he, Leon, and Ms. Rosario went to the casino, and Mr. Aviles did not express anger at Leon when trying to get Leon to return to the casino. *See id*.

Following our review, we conclude that Leon has failed to meet the required burden of demonstrating an abuse of discretion by the trial court. *See DiStefano*, 265 A.3d at 297. While it was clear that Mr. Aviles had been angry and stressed over his relationship with his live-in girlfriend and his mother's health issues, nothing in the texts indicated that Mr. Aviles harbored any ill-will against Leon specifically. Moreover, Leon's suggested link between Mr. Aviles's anger and stress in his personal life, more than eight hours before the stabbing, to the possibility Mr. Aviles would engage in a violent outburst against another person, let alone pull a knife on Leon, is far too remote and attenuated to establish the relevance of the texts. *See generally Lehman*, 275 A.3d at 519. Leon certainly wished to present Mr. Aviles's more visceral statements he was "mad," and going to "fuckin flip" or "flip shit" when discussing his mother's health issues. However, without a specific relation in

- 15 -

time or context between Mr. Aviles's stress and anger and a likelihood that Mr. Aviles would commit an act of violence, we discern no basis to disturb the trial court's ruling that the texts were irrelevant. **See id**. Thus, Leon's second issue merits no relief.[5]

In his third and final issue, Leon claims the trial court erred in denying his motion to sever the offenses related to his altercation with police from the offenses related to the stabbing of Mr. Aviles.

A motion for severance is addressed to the sound discretion of the trial court and its decision will not be disturbed absent a manifest abuse of discretion. **See Commonwealth v. Melendez-Rodriguez**, 856 A.2d 1278, 1282 (Pa. Super. 2004) (*en banc*). Pursuant to Pa.R.Crim.P. 583, the trial

---

[5] We add that the Commonwealth asserted that any error in the trial court's evidentiary ruling would be harmless. **See** Commonwealth's Brief at 22-25. The harmless error doctrine "reflects the reality that the accused is entitled to a fair trial, not a perfect trial." **Commonwealth v. Hairston**, 84 A.3d 657, 671 (Pa. 2014).

> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Id**. at 671–72. We agree with the Commonwealth that any error in this case would be harmless based on the overwhelming and uncontradicted evidence, discussed above, that supported Leon's conviction for first-degree murder and established his use of deadly force would have been unnecessary under the circumstances.

court "may order separate trials of offenses . . . if it appears that any party may be prejudiced." Pa.R.Crim.P. 583. Where the defendant moves to sever offenses which were not based on a single act or transaction, the court must determine:

> [1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, [3] whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Commonwealth v. Cole*, 167 A.3d 49, 56 (Pa. Super. 2017) (citation omitted). The prejudice of which Rule 583 speaks is that which would occur if the evidence tended to convict only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence. *See Commonwealth v. Dozzo*, 991 A.2d 898, 902 (Pa. Super. 2010).

Leon claims that the trial court erred when denying his motion to sever because the evidence related to the altercation with police and the stabbing of Mr. Aviles would not be admissible in separate trials of the other. *See* Leon's Brief at 41. He contends, in relevant part, there was no basis or rationale to explain why the altercation with police would be admissible in a trial for the stabbing when the altercation occurred after his arrest for the stabbing. Nothing about his conduct at the police station, he asserts, established his motive or identity as Mr. Aviles's killer, and the *res gestae* exception did not apply. *See id*. at 44. Leon claims that the consolidated

- 17 -

trial on the offenses did not serve the purpose of judicial economy and he suffered prejudice during the consolidated trial because the altercation with the police only served to paint him as a violent, criminal individual. ***See id***. at 47-48.

The trial court rejected Leon's argument concerning the admissibility of evidence related to the stabbing and the altercation with police officers in a separate trial of the other. ***See*** Order 6/13/22, at 3. The court explained that the evidence from the stabbing explained why Leon was in custody and could not go to the bathroom, which precipitated Leon's altercation with the police. ***See id***. The court further accepted the Commonwealth's argument that the evidence of the altercation with police explained the presence of Leon's own DNA in a sample taken after the altercation with the officers. ***See id***. The court reasoned that the blood evidence could have led a jury, in a separate trial for the stabbing, to "speculate regarding the events leading up to Mr. Aviles's death." ***Id***.; ***see also*** Commonwealth's Letter Brief in Opposition to the Motion to Sever, 6/10/22, at 3. The court further determined that the stabbing and the altercation with police officers involved discrete events which a jury could easily separate and a consolidated trial of the two incidents would not result in prejudice. ***See id***. at 3-4.

Initially, we note that Leon's appellate arguments, aside from adding new conclusions that "the trial court erred when denying his motion to sever[,]" merely repeat the arguments in support of his pretrial motion to sever. ***Compare*** Leon's Brief at 38-48 ***with*** Brief in Support of Motion to

Sever, 5/6/22, at 5-12. Leon's appellate brief lacks any dedicated argument why the trial court's specific ruling constituted an abuse of discretion. Such an argument defies our standard of review for an abuse of discretion and stands as an improper request for this Court to substitute its own judgment for that of the trial court. **See DiStefano**, 265 A.3d at 297; **Melendez-Rodriguez**, 856 A.2d at 1282. Moreover, it is not the role of this Court to act as counsel and scour the record to support a claim of error or an abuse of discretion. **See Commonwealth v. Beshore**, 916 A.2d 1128, 1140 (Pa. Super. 2007).

To the extent Leon's arguments are reviewable, we note that the trial court properly concluded that evidence concerning the stabbing, as well as Leon's arrest for the stabbing, was admissible in a trial for the altercation with police. As noted by the trial court, the circumstances surrounding the stabbing and Leon's arrest explained why Leon was present at the police station and officers attempted to prevent him from urinating, which led to the altercation. **See Commonwealth v. Brown**, 52 A.3d 320, 330–31 (Pa. Super. 2012) (noting one of the purposes of the *res gestae* exception is to allow bad acts evidence when bad acts evidence is "so clearly and inextricably mixed up with the history of" the crime at issue that it cannot be excluded without rendering the case on the crime at issue unintelligible). As to the trial court's conclusion that the evidence of the altercation with police would be admissible in a trial for the stabbing, Leon, as noted above, has failed to even address this ruling or show why it constituted an abuse of discretion or error of law. Thus, he

has not carried his burden of showing why the trial court's ruling that the altercation with police would be admissible in a separate trial for the stabbing to explain all of the blood and DNA evidence and confirm that Leon had not been injured around the time of the stabbing. *See DiStefano*, 265 A.3d at 297; *Melendez-Rodriguez*, 856 A.2d at 1282; *see also Beshore*, 916 A.2d at 1140.

Additionally, our review confirms that the trial court properly concluded that there was no possibility that the jury could confuse the evidence about the stabbing and the altercation with police as they occurred at distinct times, at different locations, and involved separate victims and witnesses. Lastly, given the wholly distinct nature of the incidents, and having reviewed the record, we discern no merit to Leon's argument that consolidation resulted in prejudice by unfairly portraying him as a violent individual. *See Dozzo*, 991 A.2d at 902. Thus, we conclude that no relief is due on Leon's final issue.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/16/2024