J-S47013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH EIBELL | : | |
| | : | |
| Appellant | : | No. 922 EDA 2024 |

Appeal from the Judgment of Sentence Entered November 29, 2023
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0004847-2022

BEFORE:  KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED MAY 2, 2025**

Joseph Eibell ("Eibell") appeals from his judgment of sentence[1] for multiple convictions of Home Improvement Fraud, Deceptive Business Practices, and Theft by Deception.[2]  We affirm.

Eibell committed what the trial court termed a "40-month saga of contractor fraud" in which he extracted thousands of dollars in down payments for home improvement services from each of nine victims.  **See** Trial Court Opinion, 5/14/24, at 1.

In April 2019, Brian Gilbert ("Gilbert"), who lived with his wife and four young children, agreed to pay Eibell $120,000 to remodel his kitchen and build

_____

[1] Eibell purports to appeal from the denial of his post-sentence motions.  His appeal properly lies from his judgment of sentence.  **See Commonwealth v. Sanchez-Frometa**, 256 A.3d 440, 442 n.2 (Pa. Super. 2021).  The caption in this case has been corrected accordingly.

[2] **See** 73 P.S. § 517.8(a)(2), 18 Pa.C.S.A. §§ 4107(a), 3922(a)(1).

an upstairs addition. *See id*. at 2. At Eibell's request, Gilbert paid a $30,000 down payment to Eibell's company, Three Brothers Renovations ("Three Brothers"), and $20,000 to PA Home Store, where Eibell said he would be buying materials. Eibell did not begin working on the property until August, 2019, nearly four months later. *See id*. at 2.

After Eibell's crew demolished Gilbert's kitchen, Eibell demanded full payment. Gilbert compromised and paid $16,000 to Three Brothers and $9,000 to Eibell personally. Eibell then removed Gilbert's roof which left the house covered only by a tarp from August to December 2019, which resulted in significant water damage to the home from seasonal storms, and later, mold damage in many areas of the home. Gilbert's requests for Eibell to finish the roof went unanswered, other than Eibell's request for more money. Gilbert paid an additional $27,000 by September 2019. *See id*. at 3.

In December 2019, Gilbert confronted Eibell at his office and demanded the name of the roofer. He contacted the roofer directly, and in December, the roofer closed the roof. Eibell stopped working thereafter; "[Gilbert's] home was left with a gutted kitchen, exposed wiring, a demolished first floor bathroom, an unfinished upstairs addition, a disconnected HVAC system, water damage, and mold." *See id*. at 3. Additionally, Gilbert did not receive any materials from the PA Home store. *See id*.

In May, June, and August 2019, Joyce McCollum ("McCollum") contracted with Eibell to install a new rain gutter and an internal door and hardware installation, fully renovate her basement, and renovate her garage.

*See id*. at 3-4.  Eibell's work was delayed and done poorly.  In September 2019, after meeting with McCollum, Eibell signed a new agreement to fix the defective work in October and November 2019; by mid-December, he still had not done so.  *See id*. at 4.  After another meeting, Eibell issued another work order with which he also failed to comply.  Eibell ultimately delivered only about one-third of the work he agreed to and for which he received $34,000.  *See id*.

In July 2019, Michael Levin ("Levin") contracted for Eibell to remodel his son's home in Philadelphia for $80,000; the contract called for the work to be completed in September and for Levin to make a $30,000 down payment, which he did.  *See id*. at 4-5.  Eibell's crew immediately cleared debris from the home and demolished it and an intact shed; progress then stalled.  *See id*. at 5.  In October, Levin discovered Eibell had never pulled construction permits to inform authorities of his forthcoming project; by the time Eibell did so, Levin had paid him a total of $60,000.  *See id*.  Other than some second floor framing, Eibell accomplished nothing beyond demolition and cleanup.  Levin later spent $17,000 to finish the basement and repair the roof.  *See id*.

In April 2020, Melissa Matthews ("Matthews") wanted a new deck for her family and contracted to pay Eibell $39,400, with a $15,000 down payment, $9,000 to him and $6,000 to Three Brothers.  After she made the payment, Matthews never saw Eibell again.  *See id*.

In August 2020, Airen Ehrlich ("Ehrlich") wanted to have her family's downstairs bathroom redone; she contacted Eibell, who quoted the job at

$12,000 and estimated it would take two weeks. Ehrlich made $9,000 in down payments by September 2020. Eibell's crew completed demolition, put up new drywall, "roughed in" the plumbing and electrical, but then ceased work. They left the bathroom untiled, with leaky plumbing, and exposed live wires, which later shocked Ehrlich's youngest child. *See id*. at 6.

In June 2021, Eibell was performing painting at Chelsea Walker's ("Walker") home, when Walker suffered flooding due to faulty plumbing. The parties agreed that within one month in exchange for $50,000, Eibell would nearly totally remodel the first and second floor, waterproof the basement, and install new plumbing. *See id*. Walker gave Eibell a $15,000 down payment. No one showed up to work for two weeks. In July, one of Eibell's employees contacted Walker to request an additional $15,000 for materials. Believing Eibell would resume work, Walker paid an additional $15,000; Eibell performed no work for nearly one month. *See id*. at 7.

In early September 2021, a worker claiming to be the foreman on the job demolished the upstairs bathroom and removed the tub, toilet, and sink. Progress again stalled until a crew demolished the rest of the second floor in October 2021, by which time Walker had paid Eibell a total of $30,000. She never received the materials Eibell claimed to have purchased, including new windows, and her copper plumbing was removed without her approval. *See id*.

In June 2021, Larry Minsky ("Minsky") entered into a $90,000 contract with Eibell to perform, within 60 days, major renovations on an investment

- 4 -

home he had bought recently. *See id*. at 7-8. Eibell demanded and received an $18,000 down payment and bi-weekly $9,000 payments. Eibell's crew completed demolition before the third payment but then ceased work. Eibell demanded money to buy kitchen materials and HVAC equipment. Minsky made the fourth through sixth payments but stopped paying when work did not resume; Eibell failed to perform virtually all of the contracted installation and replacement work, and exterior replacement work remained unfinished. Additionally, Eibell never delivered promised windows or flooring materials. *See id*. at 8.

In October, 2021, Barbara Forman ("Forman") entered into contracts worth a total of $53,800 with Eibell, who had previously done mold remediation for her, to install stairs from a back deck to the yard of her daughter's home where she had moved after her husband's death and to install a patio and an exterior walkway. *See id*. at 9. Forman paid Eibell a $22,400 down payment. *See id*. Eibell never got the architectural drawings from the township he had promised to obtain. After winter made work on the back deck impossible, Eibell promised to finish the work in the Spring. He never did so. *See id*.

In April 2022, Tim Simmons ("Simmons") paid Eibell a $6,750 down payment toward a $15,570 project to repair leaky windows and fix water damage. *See id*. at 10. Eibell performed no work in April. Simmons called Eibell's office four times in May and was told work would begin in June. In June, Eibell performed demolition, and very little other work; Simmons never

received new windows and the work that was performed was done shoddily, leaving dislodged downspouts, exposed wiring, and significant gaps in the siding beams. *See id*.

All of the victims attempted to have Eibell refund their money or perform the work he contracted to perform, but none received satisfaction. *See id*. Five victims filed civil suits; four of them received judgments by default. Eibell had no assets and no victim ever recovered damages. *See id*. at 11. Several victims also contacted the Consumer Protection Bureau, and one contacted the Bucks County District Attorney's Office. *See id*.

As a result of Forman's complaints, Detective James Schirmer ("Detective Schirmer") of the Upper Southampton Police Department discovered four other victims. *See id*. In June 2022, when Detective Schirmer questioned him, Eibell said Minsky was a "piece of sh*t," Walker was "inexperienced with money," Gilbert and Gilbert's father argued about money, and Ehrlich "cried like a baby" to police. Eibell acknowledged only his debt to Forman. Detective Schirmer arrested him that day. *See id*. at 12. Through additional detective work, Schirmer identified four additional victims, and discovered the check-cashing facility where Eibell cashed the victims' checks. *See id*.

Eibell was ultimately charged with ten counts of the above offenses, including offenses he allegedly committed against Chuck Freeberger ("Freeberger"). Eibell filed a motion seeking severance of the charges relating to each of the ten complainants. At a hearing in September 2023, the court

denied Eibell's severance motion. At a trial in October 2023, the jury convicted Eibell of the charges related to the nine victims listed above and acquitted him of all charges relating to Freeberger. In November 2023, the court imposed an aggregate sentence of two to six years of incarceration and a consecutive term of probation.

Eibell filed a timely post-sentence motion asserting sufficiency and weight claims. The court conducted a hearing on the motions in January 2024, and received Eibell's supplemental motion in February 2024. The court denied Eibell's motions. He appealed, and he and the court complied with Pa.R.A.P. 1925.

Eibell raises two issues for our appellate review:

[1.] Did the [trial] court err in failing to sever the ten complainants' cases for trial, and in ruling that separate trials in each of these ten cases was not required[?]

[2.] Did the [trial] court err in finding that the verdict was not against the weight of the evidence?

*See* Eibell's Brief at 4.

Eibell's first issue implicates the consolidation and severance of charges.

Whether to grant a motion to consolidate separate indictments is within the "sole discretion of the trial court[,] and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." *Commonwealth v. Ferguson*, 107 A.3d 206, 210 (Pa. Super. 2015) (internal citations and quotations omitted). The party appealing the grant of consolidation bears the burden of establishing prejudice. *See*

*Commonwealth v. Patterson*, 546 A.2d 596, 599–600 (Pa. 1988) (internal citations omitted); *Commonwealth v. Gray*, 296 A.3d 41, 47 (Pa. Super. 2023). The appellant must show real potential for prejudice and not mere speculation. *Commonwealth v. Rivera*, 773 A.2d 131, 137 (Pa. 2001). The prejudice from the joinder "must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." *Commonwealth v. Hobel*, 275 A.3d 1049, 1067 (Pa. Super. 2022).

Pennsylvania Rule of Criminal Procedure 582(A)(1) provides that offenses charged in separate indictments or informations may be tried together if:

> (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion . . ..

Pa.R.Crim.P. 582(A)(1)(a); *Commonwealth v. Stiles*, 143 A.3d 968, 975 (Pa. Super. 2016). If the answer to these questions is "yes," the court must determine whether defendant will be unduly prejudiced by consolidation. *See Commonwealth v. Thomas*, 879 A.2d 246, 260 (Pa. Super. 2005).[3] As our Supreme Court has further explained, the law encourages joinder of offenses and consolidation of indictments "when judicial economy can thereby be effected, especially when the result will be to avoid the expensive and time-consuming duplication of evidence." *Commonwealth v. Johnson*, 236 A.3d

---

[3] Relatedly, the court may order separate trials if it appears a party may be prejudiced by offenses tried together. *See* Pa.R.Crim.P. 583.

1141, 1150 (Pa. Super. 2020) (*en banc*) (citation omitted); **Gray**, 296 A.3d at 47. Juries are presumed to follow the trial court's instructions, including instructions relating to joined offenses. **See Commonwealth v. Mollett**, 5 A.3d 291, 313 (Pa. Super. 2010).

Eibell argues the court abused its discretion by consolidating, not severing the cases because "the time frames were different, the factual allegations were dissimilar, the relationships [among] [Eibell] and the homeowners varied, [the] events took place in different counties and more significantly[,] [] Eibell asserted unlike defenses to each case." Eibell's Brief at 18. He further maintains that other crimes or bad acts are not admissible to prove propensity to commit crime; the motive, intent, and *res gestae* theories for the admission of the evidence are inapplicable; and his defense of mistake in one case was impaired by consolidation. **See id**. at 19-25.

The trial court found that evidence of each offense would have been admissible at a trial for the others to demonstrate, *inter alia*, absence of mistake – that Eibell engaged in substantially similar conduct over nine distinct cases, **see** Trial Court Opinion, 5/14/24, at 16, and as part of the history of the case because the events largely overlapped in time, featured the "same essential motifs," and Eibell used money from some victims to pay off expenses on other jobs, **see id**. at 17-18. The court further found no danger of jury confusion, as evidenced by Eibell's acquittal of the charges relating to Freeberger, the tenth alleged victim. **See id**. at 19.

We find the trial court did not abuse its discretion, and Eibell's consolidation/severance claim lacks merit. In addition to avoiding the exhaustion of substantial resources in ten individual trials, evidence Eibell demanded extensive deposits from his customers, performed demolition work and then ceased work on the projects demonstrated a lack of mistake that would have been admissible at a trial for the individual offenses. *See Commonwealth v. Cole*, 167 A.3d 49, 57 (Pa. Super. 2017) (evidence of similar burglaries and presence in the area of the burglaries at the time they were committed admissible to show absence of mistake); *Commonwealth v. Golphin*, 161 A.3d 1009, 1021 (Pa. Super. 2017 (evidence of abuse of victims in similar manner around the same time admissible to show absence of mistake).[4]

We also agree the evidence, involving different victims, different projects, and different homes, was readily capable of separation by the jury, as demonstrated by its acquittal of Eibell on one set of charges. *See Commonwealth v. Janda*, 14 A.3d 147, 157 (Pa. Super. 2011) (rejecting assertion of jury confusion where, *inter alia*, jury convicted Janda of some crimes but acquitted him of other alleged crimes relating to another alleged victim). Moreover, the court instructed the jury to decide each charge on its

---

[4] Because we find that evidence would have been admissible for that purpose at separate trials, we do not address either the trial court's *res gestae* theory or the Commonwealth's theory that evidence of each crime would have been admissible to demonstrate a common scheme, plan or design.

own merits, *see* N.T., 10/25/23, 102-03, an instruction they are presumed to have followed. ***See Mollett***, 5 A.3d at 313. We do not perceive an abuse of discretion by the trial court in consolidating offenses and denying severance. Accordingly, we deny relief. ***See Johnson***, 236 A.3d at 1150; ***Cole***, 167 A.3d at 57; ***Golphin***, 161 A.3d at 1021.

Eibell's second argument asserts the trial court abused its discretion by declining to grant his post-verdict weight claim.

Our standard of review is settled:

> The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses.

> As an appellate court, we cannot substitute our judgment for that of the finder of fact. Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the evidence as to shock one's sense of justice. A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when the figure of [J]ustice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience.

> Furthermore, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Boyd***, 73 A.3d 1269, 1274-75 (Pa. Super. 2013) (*en banc*) (citation and internal quotation marks omitted).

Eibell asserts there is no proof of his intent to defraud because he obtained most of these projects through prior referrals, completed much of the work, and ran into difficulties with employees and suppliers during COVID-19. *See* Eibell's Brief at 26-27. He further asserts he presented evidence of prior, excellent work; he had unforeseen problems with certain jobs; the relocation of his office prevented him from learning Forman wanted a refund; and other victims terminated their contracts precipitously. *See id*. at 27-35.

The trial court determined the jury's verdicts did not shock its conscience because the evidence demonstrated Eibell's intent to defraud, as shown by his failure to complete projects or refund deposits despite repeated demands, and acceptance of additional contracts knowing he did not have the capacity to complete them. *See* Trial Court Opinion, 5/14/24, at 20-28.

The trial court did not abuse its discretion by denying Eibell's weight claim, which seeks appellate reassessment of the evidence in the light most favorable to him, rather than our limited review of the trial court's exercise of discretion. Eibell presents nothing to show the trial court abused its discretion by declining to overturn the jury's credibility-based determinations. *See* *Boyd*, 73 A.3d at 1274-75. No relief is merited.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>5/2/2025</u>